# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL HICKENBOTTOM, As Personal Representative of the Estate of Michael Ellerbe, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 03-223 |
| | ) | |
| SAMUEL NASSAN, JUAN CURRY, In Their Individual and Official Capacities, JOHN DOE, RICHARD ROE, (Unidentified in Name and Number), In their Individual and Official Capacities, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM ORDER</u>

<u>Conti</u>, District Judge.

This action arises out of the shooting death of Michael Ellerbe, age twelve at the time of his death, in the course of the pursuit of Michael Ellerbe on foot by defendants Samuel Nassan ("defendant Nassan") and Juan Curry ("defendant Curry"), two Pennsylvania State Police Troopers (collectively "defendants"). The pursuit occurred after Michael Ellerbe fled from a stolen car stopped by defendants on December 24, 2002, in Uniontown, Pennsylvania. Plaintiff Michael Hickenbottom, the father of Michael Ellerbe, as personal representative of the Estate of Michael Ellerbe ("plaintiff"), asserts various constitutional and statutory claims pursuant to 42 U.S.C. §§ 1983 and 1985(3), as

well as a number of pendant state tort claims. In this memorandum order, the court

considers the motion for summary judgment (Doc. No. 68) filed by defendants with

respect to all claims asserted against them by plaintiff.  For the reasons that follow, after

considering the joint statement of material facts, the motion, the submissions of the

parties and the arguments of counsel at the oral hearing on the motion, the court will grant

in part and deny in part defendants' motion.

## I. PROCEDURAL BACKGROUND

Before this court can adequately set forth the factual background in this case, it

must first resolve a number of procedural disputes that have arisen between the parties

over the effect that certain requirements of the Federal Rules of Civil Procedure and this

jurisdiction's local rules of court have on this court's discretion to consider a number of

the documents submitted by plaintiff.

This case has an extensive procedural history reaching back over four years to the

filing of the initial complaint on February 14, 2003.  (Doc. No. 1).  The discovery process

in this case has been long and arduous.  This court ordered the initial Rule 26(a)

disclosures to be served in April and May 2004.  (Doc. No. 17).  After delays, the court

signed an initial case management order on July 26, 2004, that set January 17, 2005, as

the date for discovery cutoff.  (Doc. No. 37).  The cutoff date was extended several times

until July 14, 2005.  (Doc. Nos. 41, 44, 46). After numerous delays relating to expert

testimony, this court on May 18, 2006, finally held a hearing on challenges to expert

testimony.  (Doc. No. 66).  A few days after the hearing this court issued a case

management order requiring the movant to file its summary judgment motion by June 19,

2006, and the opposing party to file its response by July 19, 2006.  (Doc. No. 67).  At the

hearing on May 18, 2006, the court also stated that it would hear argument on the

summary judgment motion on October 19, 2006.  (Doc. No. 66).

Defendants filed a motion for summary judgment, (Doc. No. 68), a brief in

support, (Doc. No. 69), a concise statement of facts, (Doc. No. 70), and an appendix,

(Doc. No. 71), on June 19, 2006.  Plaintiff then twice moved for and was granted

extensions of time to file a response.  (Doc. Nos. 73-74, 75, 77).  On August 11, 2006,

plaintiff  filed his response to defendants' motion for summary judgment ("Response"),

(Doc. No. 78), as well as his response to defendants' concise statement of facts with a

number of exhibits attached.  (Doc. No. 79).  In their reply brief in support of motion for

summary judgment ("Reply Brief"), defendants strongly objected to much of the record

evidence submitted by plaintiff, arguing that his submissions of an unverified complaint,

certain unsworn statements, and portions of certain expert affidavits should not be

considered by this court.  See Defs.' Rep. Br. (Doc. No. 83) at 1, 2 n.2, 5-6.  On

September 5, 2006, defendants filed the joint concise statement of material facts.  (Doc.

No. 84).

Plaintiff made no further attempts to submit materials or respond to defendants'

Reply Brief  prior to the October 19, 2006 hearing.  At the hearing, this court addressed

potential problems with many of plaintiff's factual submissions.  Defendants' Response to

Plaintiff's "Supplemental" Brief  ("Defs.' Resp. to Pl.'s Suppl. Br."), Ex. A (summary judgment hearing transcript) at 3-10.  This court informed the parties that briefs should be submitted on the merits of defendants' objections to plaintiff's factual submissions.  Id. at 5, 39-42, 53-54.

Plaintiff's counsel argued at the hearing that the problems with the evidence could be cured.  Id. at 5-6.  He first argued that the law in this jurisdiction would allow the disputed material into evidence.  Id. at 6.  He asked the court for permission to cure the potential problem with an unsworn investigator's report of an interview of Melvin Duley ("Duley") by introducing the deposition of Duley into the record.  Id. 6-7.  Plaintiff's counsel stated that defendants were not prejudiced because they had the deposition in their possession previously and explained that he only received the deposition three days before the hearing "because of an administrative screw up. . . ."  Id. at 7.  He argued that the deposition "contradict[ed] every important aspect of the police officers' testimony . . . ."  Id. at 7.

Plaintiff's counsel attempted to cure the admissibility problems with the challenged unsworn statements of several other witnesses by making legal arguments and submitting actual audiotapes of the interviews of the witnesses.  Id. at 8-9.  Counsel then turned the court's attention to statements made by defendant Nassan that were recorded in a police report prepared by another witness, Sergeant Baranowski.  Id. at 10-11.  Counsel claimed that the statements in the report contradicted essential elements of defendant Nassan's account of the incident.  Id. at 11-12, 15.  Although plaintiff's counsel said he

had only learned about the police report one and one-half hours before the hearing, id. at

11-13, defendants' counsel pointed out that the report was in the record in defendants'

appendix of exhibits.  Id. at 13.  Finally, plaintiff's counsel also attempted to explain the

failure to include a verified affidavit or deposition from Sergeant Baranowski, rather then

just the unverified complaint he submitted.  Id. at 20.  He stated that the deposition of

Sergeant Baranowski had been delayed, id. at 20, and an affidavit was "en route."  Id. at

22.  The court noted that plaintiff's counsel had not sought an extension of discovery.  Id.

Defendants' counsel objected arguing that allowing plaintiff's counsel to admit

new evidence or alter plaintiff's arguments would be unfair to defendants, particularly in

light of the lengthy discovery process in this case.  Id. at 30-32.  This court concluded that

briefs were required to address the evidentiary disputes.  Id. at 34.  Plaintiff was directed

to file a brief with the court within twenty days explaining why each disputed piece of

evidence should be considered and addressing whether plaintiff could still prevail even if

the evidence were excluded.  Id. at 34, 37-38, 42, 43, 53.  Defendants were directed to file

a response twenty-eight days afterwards.  Id. at 41.

Both parties submitted the required briefs.  (Doc. Nos. 87, 88).  In order to resolve

whether defendants' objections to the submissions of plaintiff should be sustained, this

court must address three issues: 1) whether this court can consider the unsworn

statements and the unverified complaint submitted by plaintiff, 2) whether plaintiff should

be deemed to have admitted a number of the material facts set forth in defendants'

concise statement of facts by reason of plaintiff's failure to comply with local rules of

court that require a party opposing summary judgment to identify with specificity the basis for disputing the opposing party's material facts, and 3) whether plaintiff should be granted leave to submit the late-filed deposition of Duley and the affidavit of Sergeant Baranowski under Federal Rule of Civil Procedure 56(f) or under this court's discretionary powers under Federal Rules of Civil Procedure 6(b) and (d) and 16.

### A.  Admissibility of the unsworn statements and unverified complaint

On June 19, 2006, defendants filed their motion for summary judgment.  On August 11, 2006, plaintiff filed his response and his response to defendants' concise statement of facts with seventeen exhibits attached in an appendix.  Pl.'s Resp. to Stmt. of Facts (Doc. No. 79).  The exhibits included sworn affidavits from four experts, sworn affidavits from two witnesses, both defendants' depositions, a copy of a federal district court unpublished opinion decision, the deposition of Pennsylvania State Police Trooper Scott D. Myers, and photographs of the scene.  The exhibits also included an unverified copy of a complaint filed by Pennsylvania State Police Sergeant James E. Baranowski in another civil action in the United States District Court for the Western District of Pennsylvania.  Plaintiff Appendix ("Pl.'s App."), Ex. A.  Finally, the exhibits also included the unsworn statements of five other witnesses:  Twila Evans at Exhibit H; Duley at Exhibit I; Angela Lee at Exhibit M; Trinea Jacobs Ramsey at Exhibit O; and Harold Bailey at Exhibit Q.

Plaintiff argues in his supplemental brief in opposition to defendants' motion for summary judgment that the five unsworn statements and the unverified complaint can be

considered at the summary judgment stage because Federal Rule of Civil Procedure 56

("Rule 56") only requires that evidence be admissible in content and not in the form

required at trial.  Plaintiff's Supplemental Brief in Opposition to Defendants' Motion for

Summary Judgment ("Pl.'s Suppl. Br.") at 2.  He argues that hearsay evidence can be

"considered if the out-of-court declarant could later present that evidence through direct

testimony, i.e., in a form that would be admissible at trial.'"  Id. (quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986)).  Plaintiff asserts that the evidence in the unsigned

statements and the unverified complaint could be presented at trial because the witnesses

are local witnesses who are willing to testify to the substance of the contested materials.

Id. at 4-5.

    Defendants reply that a summary judgment motion may only be opposed by those

materials specifically identified in Rule 56(c) and that the five unsworn statements and

the unverified complaint do not fall under any of those categories.  Defendants' Response

to Plaintiff's "Supplemental Brief" ("Defs.' Resp. to Pl.'s Suppl. Br.") (Doc. No. 88) at 4-

6.  This court agrees that Rule 56 controls the kinds of material that may be considered by

a district court in ruling on a motion for summary judgment and that unsworn statements

or unverified complaints are not included in the materials that may be considered.

    Rule 56(c) provides that a summary judgment motion shall be granted if "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and the

moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

Plaintiff is correct that this rule does not require all evidence submitted in opposition in summary judgment to be in a form admissible at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The rule, however, does not allow evidence in *any* form to be considered.  Id.  Rather, the rule specifically provides the avenues by which inadmissible hearsay evidence can be submitted at the summary judgment stage.  Id.

Plaintiff quotes the Supreme Court's statement in Celotex that the nonmoving party is not required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  Pl.'s Suppl. Br. at 2 (quoting Celotex, 477 U.S. at 324).  Yet, the Supreme Court explained that "Rule 56(e) permits a proper summary judgment motion to be opposed by *any of the kinds of evidentiary materials listed in Rule 56(c)*, except the mere pleadings themselves."  Celotex, 477 U.S. at 324 (emphasis added).  Celotex merely confirms, as do the other decisions cited by plaintiff, that an opposing party on a summary judgment motion may submit evidence in a form that would not be admissible at trial *if* it is submitted in a form listed in Rule 56(c).  Id.; see Williams v. Borough of West Chester, Pa.,. 891 F.2d 458, 466 (3d Cir. 1989) ("[H]earsay evidence produced *in an affidavit* opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony . . . .") (emphasis added).

The contested materials here do not satisfy the requirements of 56(e)[1] so as to qualify as affidavits, the form of evidence listed in Rule 56(c) that they most closely imitate.  An affidavit is "[a] written or printed declaration or statement of facts made voluntarily, and confirmed by the oath or affirmation of the party making it, taken before a person having authority to administer such oath or affirmation."  BLACK'S LAW DICTIONARY 58 (6th ed. 1990).  Unsworn statements are too unreliable to satisfy Rule 56(e)'s requirements.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n.17 (1970) (an unsworn statement does not satisfy the requirements of FED. R. CIV. P. 56(e)); Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir 2005) (affirming the district court's refusal to consider an unsworn statement in disposing of a summary judgment); Small v. Lehman, 98 F.3d 762, 765 n.5 (3d Cir. 1996) (unsworn statements do not meet the requirements of Rule 56(e)); Fowle v. C & C Cola Div. of ITT-Continental Baking Co., 868 F.2d 59, 67 (3d Cir. 1989) (same); see also Markel v. Board of Regents of University of Wisconsin, 276 F.3d 906, 912 (7th Cir. 2002); Chaiken v. VV Pub. Corp., 119 F.3d 1018, 1033 (2d Cir. 1997); Watts v. Kroger, Co., 170 F.3d 505, 509 (5th Cir. 1999); Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 968-69 (6th Cir. 1991).

An unverified complaint likewise is deficient unless converted into an affidavit through verification.  See Ford v. Wilson, 90 F.3d 245, 247 (7th Cir. 1996) ("By

---

[1] Rule 56(e) clearly identifies the requirements for proper affidavits: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  FED. R. CIV. P. 56(e).

declaring under penalty of perjury that the complaint was true . . . [the plaintiff] converted

. . . those factual assertions in that complaint that complied with the requirements for

affidavits . . . into an affidavit."); <u>Neal v. Kelly</u>, 963 F.2d 453, 457 (D.C. Cir. 1992)

(same).  Here, the unverified complaint was not converted into an affidavit and thus does

not satisfy the requirements of Rule 56.  <u>See</u> <u>Mitnik v. Cannon</u>, 789 F. Supp 175, 176

(E.D. Pa. 1992) (holding that plaintiffs could not rely on unsworn statements and

allegations in their complaint); <u>King v. Dogan</u>, 31 F.3d 344, 346 (5th Cir. 1994) (holding

that an unverified complaint is not competent summary judgment evidence).[2]

Therefore, this court will not consider the unsworn statements of Twila Evans,

Melvin Duley, Angela Lee, Trinea Jacobs Ramsey, or Harold Bailey or the unverified

complaint of Sergeant Baranowski for the purpose of deciding the motion for summary

judgment.

---

[2] Although it is true that, unlike here, most of the cited decisions involved the unverified complaints of the plaintiff in the same action, the complaint at issue here carries with it no greater indicia of reliability simply because it is from another action, nor does it fall under a category of evidence listed in Rule 56(c).  Regardless, the <u>Baranowski</u> complaint is deficient because it contains primarily general and unsubstantiated allegations that do not qualify as factual assertions made on personal knowledge. <u>See</u> 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1339, at 152 (2d ed. 1990) (explaining that a pleading can qualify as an affidavit only if contains facts known to be true in the affiant's own personal knowledge and has a certain level of factual specificity).  The mere signing of the complaint by Sergeant Baranowski's counsel in the other action also does not convert it into an affidavit.  <u>See Markel v. Board of Regents of University of Wisconsin</u>, 276 F.3d 906, 912 (7th Cir. 2002) (affidavit signed only by counsel could not be considered on summary judgment); <u>Schoch v. First Fidelity Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990) (unsworn statements of counsel in memoranda submitted to the court are insufficient for summary judgment purposes).

**B. Facts deemed admitted under the local rules of court**

Defendants also argue that a large number of the facts set forth in their concise statement of facts should be deemed admitted for the purpose of the summary judgment motion because plaintiff failed to comply with the local rules of court and responded to a number of defendants' factual statements with inapplicable, vague, or incorrect references to the record. Defs.' Resp. to Pl.'s Suppl. Br. at 6. Defendants cite to their factual allegations in eighteen paragraphs of the joint concise statement of material facts that they allege have been admitted. Id. at 6. Plaintiff only indirectly responds to this contention by including a section in his supplemental brief setting forth the record evidence, including some materials not previously referenced, that plaintiff believes creates disputes of material fact sufficient to defeat defendants' motion for summary judgment. Pl.'s Suppl. Br. at 8-15.[3]

Local Rule of Court 56.1.B.1 requires the moving party on a motion for summary judgment to submit with it a concise statement of material facts "setting forth the facts essential for the court to decide the motion for summary judgment, which the moving party contends are **undisputed and material** . . . ." Local Rule of Court 56.1.B.1 (emphasis in original). The facts are to be listed in separately numbered paragraphs and supported with a specific record reference. Id. Thus, for the facts in each paragraph, "[a]

---

[3] Relatively specific citations for many of plaintiff's factual allegations were included in the supplemental brief. Defendants argue, however, that plaintiff continued to misrepresent the record. Defs.' Resp. to Pl.'s Supp Br. at 6.

party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact."  Id.

Local Rule of Court 56.1.C.1(a) likewise  requires the party opposing summary judgment to file a responsive concise statement of material facts that admits or denies whether each statement in the movant's concise statement of material facts is undisputed or not material.  The opposing party is also required to set forth the basis for any denial of a fact in the moving party's concise statement with specific reference to the record as described in Rule 56.1.B.1.  Local Rule of Court 56.1.C.1(b).[4]  Local Rule of Court 56.1.E describes the consequence of either party's failure to follow these rules, explaining that facts claimed to be undisputed "will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."  Local Rule of Court 56.1.E.

Plaintiff's responses to some of the factual allegations in defendants' concise statement are supported with inaccurate or vague record references or include argument. See, e.g., Joint Concise Statement of Material Facts ("J.S.") ¶ 9 (plaintiff's response).

---

[4] Local Rule of Court 56.1.C.1(b) states that the responsive concise statement should respond to each numbered paragraph in the movant's concise statement by providing the "basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (See LR 56.1B(1) for instructions regarding format and annotation)."

When viewing the facts set forth in plaintiff's responsive concise statement and supplemental brief in the light most favorable to the plaintiff, see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), this court will not deem admitted all the allegations in the eighteen paragraphs pointed to by defendants. Defs.' Resp. to Pl.'s Suppl. Br.. at 6. This court will deem admitted for the purposes of deciding summary judgment only those portions of the defendants' factual allegations that plaintiff disputes with materials that were not found to be proper under Rule 56(c) and that are not otherwise contradicted by the record. See, e.g., J.S. ¶ 21.

Defendants have had an opportunity to respond to plaintiff's additional allegations in their response to plaintiff's supplemental brief where they argued that their summary judgment motion should be successful even if plaintiff's supplementary materials are considered. Defs.' Resp. to Pl.'s Suppl. Br. at 3. It is also within the court's discretion to direct different procedures as the circumstances require. See Local Rule of Court 56.1.A ("The procedures that follow shall govern all motions for summary judgment . . . unless the court, on its own motion, directs otherwise, based on the particular facts and circumstances of the individual action.").[5] This approach permits the court to take stock of the "entire setting" of the case when ruling on summary judgment. See 10A CHARLES

---

[5] Further, "the choice of materials to be considered in conjunction with a summary judgment motion is within the discretion of the trial judge . . . . [T]he case management powers accorded to federal trial judges under Federal Rule of Civil Procedure 16 are controlling in this regard." Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 494 F. Supp. 1161, 1168 (E.D. Pa. 1980); see Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc., 853 F.2d 834, 841 (11th Cir. 1988).

A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2721, at 366

(1998) ("The parties need not formally offer their outside matter as evidence or have it

marked as an exhibit at the hearing on the motion. Given this process, the court is obliged

to take account of the entire setting of the case on a Rule 56 motion.").

**C.  *Admissibility of late-filed Duley deposition and Baranowski affidavit***

The most heavily contested procedural aspect here relates to plaintiff's attempts to

submit additional materials for the court's consideration in ruling on the motion for

summary judgment.  Along with his supplemental brief, plaintiff submitted two additional

materials for this court's review:  the deposition of witness Duley, labeled Exhibit

A,[6] and an affidavit of James E. Baranowski, labeled Exhibit B.

---

[6] Plaintiff attempts to protect against the potential for non-consideration of Duley's
unsworn affidavit by citing to evidence referring to Duley in a police report included in
defendants' exhibits.  In the last section of his supplemental brief, plaintiff lists the evidence in
the record that he argues defeats summary judgment by creating material factual disputes.  Pl.'s
Suppl. Br. at 8-15.  In that section, plaintiff notes that in exhibit 9 of defendants' Appendix of
Exhibits ("Defs.' App.") defendants included a police report in which Officer David Davison
recites an interview of Duley three days after the shooting.  Id. at 12.  Plaintiff appears to suggest
that Duley's hearsay statements in the report should be considered by this court on summary
judgment because defendants submitted the report.  Id. at 12.  Plaintiff also cites to a number of
statements that were made by defendants and recorded in various police reports in the same
exhibit.  Id. at 11-12, 14.

Officer Davison's report constitutes two pages of a large three hundred page attachment
that defendants label as "Attachment 3 to General Investigation Report, IAD #20002 845" and
includes what appears to be a portion of a complete copy of an extensive "Homicide
Investigation Report" by the Pennsylvania State Police.  See Defs.' App., Ex. 9 at 68.  Plaintiff's
counsel aptly described the exhibit as a "massive submission" at the summary judgment hearing
when he explained why he had not previously noticed statements contained in a portion of that
exhibit.  Defs.' Resp. to Pl.'s Supp Br., Ex. A at 15 (summary judgment hearing transcript).
Plaintiff provides no authority to support the suggestion that defendants should be deemed to
have waived all evidentiary challenges to the admission of the material in this extensive report
simply by including a complete copy of the report for this court's consideration with its motion

Plaintiff argues that this court should consider these two documents under its authority to extend discovery under Federal Rule of Civil Procedure 56(f) and to allow documents to be supplemented under Rule 56(e).  Pl.'s Suppl. Br. at 5-6.  He argues that these provisions provide this court with broad authority to extend discovery and argues that the "overall goal is to reach a just decision."  Id. at 6.  He asserts that it "would be a miscarriage of justice" to ignore these two important pieces of evidence for purposes of deciding the motion for summary judgment.  Id. at 7.

_____

for summary judgment.

The United States Court of Appeals for the Fourth Circuit has concluded in one decision that the defendants waived their objection to the admissibility of a police report that contained double hearsay when they submitted it to the district court on at least three separate occasions. Motor Club of America Insurance Co. v. Hanifi, 145 F.3d 170, 175 (4th Cir. 1998).  Defendants here, however, have not repeatedly submitted the contested report like the defendants in that case. Further, the contested statements in that case were in a police report that does not appear to have approached the size and volume of the massive report submitted by defendants here.

At the summary  judgment stage this court may normally consider materials other than those listed in Rule 56(c) only if they would be admissible at trial.  See Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995).  Although the conclusions and opinions in a police report are admissible in some circumstances under the public records exception of  Federal Rule of Evidence 803(8), any statements or observations of others in those reports are double hearsay and inadmissible unless covered by a separate hearsay exception.  See United States v. Sallins, 993 F.2d 344, 347 (3d Cir. 1993); see also Rolan v. Vaughn, 445 F.3d 671, 683 (3d Cir. 2006).

This court cannot consider Duley's statements in the police report because they are not covered by any other hearsay exception.  This court can, however, consider statements made by defendant Curry and defendant Nassan which were recorded in the police reports.  Those statements qualify as the nonhearsay admissions of a party-opponent under Federal Rule of Evidence 801(d)(2)(A).  See United States v. Green, 258 F.3d 683, 690 (7th Cir. 2001); United States v. Abell, 586 F. Supp. 1414, 1425 (D. Me. 1984).

Defendants, on the other hand, suggest that it would be a miscarriage of justice to consider the materials.  They argue that plaintiff should not be allowed to ignore this court's deadlines after the long discovery period here without providing any legitimate reason.  Defs.' Resp. to Pl.'s Suppl. Br. at 10-11.  Further, they argue that plaintiff has not satisfied the requirements of Rule 56(f) by reason of plaintiff's failure to file a Rule 56(f) affidavit and failure to explain why he has not previously obtained the material.  Id. at 12. Finally, defendants argue that plaintiff's failure to introduce the Duley deposition was the result of an intentional strategic choice because portions of the deposition may contradict plaintiff's theory of the case.  Id. at 10, 14-17.  Defendants argue that plaintiff should be bound by his strategic decision.  Id. at 17.  This court will not consider the plaintiff's late submitted affidavit, but will exercise its discretion to consider the deposition of Melvin Duley.

It is firmly established that a court "is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery."  Dowling v. City of Philadelphia, 855 F.2d 136, 139 (3d Cir. 1988).  If a party opposing summary judgment believes that additional discovery is necessary, the proper procedure is to file a motion pursuant to Rule 56(f) for additional time for discovery.[7]  Id.  "District courts usually grant properly

_____

[7] Federal Rule of Civil Procedure 56(f) provides:

> Should it appear *from the affidavits* of a party opposing the [summary judgment] motion that the party cannot for *reasons stated* present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had

filed Rule 56(f) motions as a matter of course."[8]  St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309, 1314 (3d Cir. 1994).

In filing a motion, Rule 56(f) "specifies the procedure to be followed, and explicitly provides that the party must file an affidavit setting forth why the time is needed."  Pastore v. Bell Telephone Co., 24 F.3d 508, 510-11 (3d Cir. 1994).  The United States Court of Appeals for the Third Circuit has emphasized that the filing of a proper affidavit is a *requirement* and has held that the failure to do so is normally fatal to the motion.  See id. at 511; Lunderstadt v. Colafella, 885 F.2d 66, 70-71 (3d Cir. 1989); Dowling, 855 F.2d at 139-40.  Failure to meet this technical requirement of the rule is not automatically fatal to the Rule 56(f) motion.  St. Surin, 21 F.3d at 1314.  The court, however, employs a strong presumption against findings of constructive compliance with Rule 56(f).  Bradley v. United States, 299 F.3d 197, 207 (3d Cir. 2002).  Thus, "in all but the most exceptional cases" an affidavit is required.  Id. (citing Pastore, 24 F.3d at 11).

—————————————————

or may make such other order as is just.

FED. R. CIV. P. 56(f) (emphasis added).

[8] This is particularly the case when material facts are solely in the possession of the moving party, Ward v. United States, 471 F.2d 667, 670 (3d Cir. 1973), or where discovery requests are outstanding.  Sames v. Gable, 732 F.2d 49, 51-52 (3d Cir. 1984).  Neither of these situations are applicable here.  Discovery requests were not outstanding and the witnesses who provided the disputed information were available to both parties.

17

Constructive compliance with the affidavit requirement will not be found unless the movant satisfies Rule 56(f)'s basic requirements that he "specify 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" Pastore, 24 F.3d at 11 (quoting Dowling, 855 F.2d at 140). In explaining why the information has not been previously obtained, the moving party must show good cause for not having discovered the information sooner. See Lunderstadt, 885 F.2d at 71-72. If the party's need is the result of his own lack of diligence, he will normally not receive relief under Rule 56(f). See id.; see also Strag v. Bd. of Trs., 55 F.3d 943, 954 (4th Cir. 1995); Resolution Trust Corp. v. North Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994) ("Rule 56(f) is designed to minister to the vigilant, not to those who slumber upon perceptible rights.").

To receive relief under Rule 56(f), an opposing party is also required to make his motion within a reasonable time after receiving the motion for summary judgment. Massachusetts School of Law at Andover, Inc., v. American Bar Ass'n, 142 F.3d 26, 44 (1st Cir. 1998). A reasonable time "means that a Rule 56(f) motion normally should precede or accompany the response to the summary judgment motion or follow as soon as practicable thereafter." Id.; Ashton-Tate Corp. v. Ross, 916 F.2d 516, 520 (9th Cir. 1990) ("implication and logic require that a Rule 56(f) motion be made prior to the summary judgment hearing.").

Plaintiff's invocation of Rule 56(f) is problematic here. Plaintiff has not filed the required Rule 56(f) affidavit, but only argued in his supplemental brief that Rule 56(f)

applies here.[9]  Pl.'s Suppl. Br. at 5-7.  Plaintiff has also not shown the existence of

exceptional circumstances which would implicate the applicability of an exception from

the technical requirements of the rule and permit the court to construe his supplemental

brief as a Rule 56(f) affidavit.  Plaintiff has not offered a strong explanation with respect

to why he could not have obtained the additional materials sooner.  He fails in his

supplemental brief to provide any reason for his failure to submit the Baranowski

affidavit prior to the submission of his supplemental brief.[10]

Plaintiff argues that the late filing of the Duley deposition was a result of

inadvertence.  He asserts that, although "counsel believes he ordered a copy of the

transcript," "counsel did not realize that it was never sent" "until Plaintiff's response was

being filed . . . ."[11]  Pl.'s Suppl. Br. at 3 n.1.  Plaintiff's counsel, however, fails to explain

why he did not bring the Duley deposition to the attention of this court prior to the

---

[9] Plaintiff first attempted to submit the Duley deposition at the summary judgment
hearing.  Defs.' Resp. to Pl.'s Suppl. Br., Ex. A at 6.

[10] At the summary judgment hearing, plaintiff's counsel attempted to shift some of the
blame for the failure to obtain an affidavit from Sergeant Baranowski to the defendants.  He
argued that he intended to rely on the deposition of Sergeant Baranowski, but was unable to do
so when that deposition was repeatedly delayed due to scheduling conflicts between the
defendants and Baranowski's counsel.  Defs.' Resp. to Pl.'s Suppl. Br., Ex. A at 20, 44.
Plaintiff, however, fails to provide a sufficient reason why he is entitled to rely on the discovery
in another case and could not have taken the deposition during the applicable lengthy discovery
period in this case or obtain an affidavit.

[11] Plaintiff's counsel also noted at the summary judgment hearing that, because of an
"administrative screw up " he did not receive the deposition until three days prior to the hearing.
Defs.' Resp. to Pl.'s Suppl. Br., Ex. A at 7 (summary judgment hearing transcript).

summary judgment hearing when he had it in his possession three days before the

hearing.  See Defs.' Resp. to Pl.'s Suppl. Br., Ex. A at 7 (summary judgment hearing

transcript).

In light of plaintiff's failure to comply with the requirements of Rule 56(f), it is

within this court's discretion to deny his Rule 56(f) motion and refuse to consider

plaintiff's supplementary materials.  The inquiry does not end with that matter.  Plaintiff

argues that the provisions of Rule 56(f) and Rule 56(e) when taken together indicate that

"the overall goal is to reach a just decision considering all the facts of the case with the

Court being given the power to enter any order to allow for additional discovery and

evidence which is to be considered before a case is dismissed."  Pl.'s Suppl. Br.. at 6.

Although plaintiff understates the importance of complying with the rules, district courts

do have significant discretion under the rules when determining whether to accept late

materials.

Rule 56(c) limits an adverse party to serving opposing affidavits only until "prior

to the day of the hearing . . . ."  FED. R. CIV. P. 56(c).  This court has broad discretion to

determine what materials to consider on summary judgment under its case management

powers.  See FED. R. CIV. P. 16.[12]  Rule 56(e) also grants the court the ability to "permit

affidavits to be supplemented or opposed by depositions . . . or further affidavits."  FED.

---

[12] Supra note 5.

R. CIV. P. 56(e); see Chaudoin v. Atkinson, 406 F. Supp. 32, 35 (D. Del. 1975) (noting

that, where Supreme Court precedent altered the applicable legal standard, plaintiff

seeking key deposition is in "the type of situation in which . . . [Rule 56(e)] contemplates

that a party . . . will be given an opportunity to further develop the record.").

Most importantly, Rule 56(c) is qualified by Rule 6(d) and (b).  First, Rule 56(c)

should be read in conjunction with Rule 6(d) which authorizes the court to permit

opposing affidavits "to be served at some other time."[13]  See L.D. Woods v. Allied

Concord Financial Corp. (Del.), 373 F.2d 733, 734 (5th Cir. 1967); see also Beaufort

Concrete Co. v. Atlantic States Constr. Co., 352 F.2d 460, 462 (5th Cir. 1965) (arguing

that the Rule56(c) time limit "permits no exception . . . .  does not comport with the

liberal tenor of the Federal Rules, and is not justified by any singularity of the motion for

summary judgment.").  Second, Rule 6(b) grants the court broad discretion to enlarge the

time for an act required under the rules.  L. D. Woods, 373 F.2d at 734; Beaufort

Concrete Co. 352 F.2d at 462.

Based upon these rules, it is "solely within the court's discretion" to accept a late

filed opposing affidavit,  Nestle Co., Inc., v. Chesters Market, Inc., 571 F. Supp. 763, 772

---

[13]   The relevant text states:
> When a motion is supported by affidavit, the affidavit shall be served with the
> motion; and . . . opposing affidavits may be served not later than 1 day before the
> hearing, *unless the court permits them to be served at some other time*.

FED. R. CIV. P. 6(d) (emphasis added).

(D.Conn. 1983), such as one filed on the day of the summary judgment hearing. <u>L.D. Woods v. Allied Concord Corp.</u>, 373 F.2d 733, 734 (5th Cir. 1967); <u>Blackburn v. Prudential Lines, Inc.</u>, 454 F. Supp. 1302, 1306 (E.D. Pa. 1978).

This discretion, however, is not without limit.  Courts will usually reject late filed materials where the party seeking further time has not "offered any explanation or justification . . . for his failure to comply with the time requirement of Rule 56(c)." <u>Blackburn</u>, 454 F. Supp. at 1306; <u>see</u>  <u>Nestle Co., Inc.</u>, 571 F. Supp. at 772-73; <u>Beaufort Concrete Co.</u>, 352 F.2d at 463.  Courts have also shown an unwillingness to accept late filed materials where they prejudiced the opposing party because he had no knowledge of their existence.  <u>Blackburn</u>, 454 F. Supp. at 1306 ("Using Rule 6(d) to permit the affidavit to be used in opposition to defendant's motion . . . would be unfair to defendant, which filed the motion, replied to plaintiff's opposition to the motion and argued the motion without knowledge of the existence of the affidavit.").  Moreover, courts have noted that "Rule 56(c) and 6(d) should be read in conjunction with Rule 6(b) . . . ." <u>Schafer Bakeries, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., Gen. Drivers Union, Local 332</u>, 650 F. Supp. 753, 756 (E.D. Mich 1986).  Rule 6(b) "sets out the proper approach" for late filings, and only allows for an extension of time for

materials filed after a deadline where excusable neglect is shown.[14]  Lujan v. National Wildlife Fed'n, 497 U.S. 871, 896-97 (1990).

"Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant."  In re Orthopedic Bone Screw Prods. Liab. Litig., 246 F.3d 315, 322 (3d Cir. 2001) (quoting Pioneer Inv. Servs. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 391 (1993)).  The determination as to what constitutes excusable neglect is an "equitable one, taking account of all relevant circumstances surrounding the party's omission. . . ."  Pioneer Inv. Servs., 507 U.S. at 395.  The following relevant factors are considered: "I) the danger of prejudice to the nonmovant; ii) the length of the delay and its potential effect on judicial proceedings; iii) the reason for the delay; and iv) whether the movant acted in good faith."  DaSilva v. Esmor Correctional Servs. Inc.,  215 F.R.D. 477, 483 (D. N.J. 2003) (citing Pioneer Inv. Servs., 507 U.S. at 392).

---

[14] Rule 6(b) provides:
> When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion . . . upon motion made *after the expiration of the specified time period* permit the act to be done where the failure to act was the result of *excusable neglect*.

Fed. R. Civ. P. 6(b) (emphasis added).

After considering the relevant circumstances in this case this court concludes for several reasons that it should not exercise its discretion to consider the Baranowski affidavit in deciding the motion for summary judgment.  First, admitting the affidavit would prejudice the defendants who had no knowledge of the affidavit prior to its late admission.  The unverified complaint included in plaintiff's original response to defendants' motion for summary judgment did not put defendants on notice with respect to the material in the affidavit because the matters set forth in the complaint were substantially different from the matters referred to in the affidavit.  Second, plaintiff's first attempt to submit the affidavit occurred when plaintiff attached it the supplemental brief that he filed on November 2, 2006, two weeks after the October 19, 2006 summary judgment hearing.[15]  See Pl.'s Suppl. Br., Ex. B.  Courts have been ill disposed to admit affidavits that were submitted after the summary judgment hearing, especially without a good reason to do so.  See, Nestle Co., Inc., 571 F. Supp. at 763 (court refused to consider a motion filed a month after oral argument where party failed to offer any explanation for its late filing).

---

[15] Plaintiff's counsel noted at the summary judgment hearing with respect to the affidavit:  "As a matter of fact - - well, I was going to say that we have an affidavit that's actually en route because of something that was discovered, again, at a late hour, but I understand the difficulty that is presented by this evidence."  Defs.' Resp. to Pl.'s Supp. Br., Ex. A at 22.  Merely noting that an affidavit was on the way gave the court and the defendants no warning  as to its contents.  Moreover, this court noted at that time that if plaintiff required additional time to submit material he should have requested an extension prior to the hearing.  Id.

Finally, as noted above, plaintiff has not provided an adequate reason to explain the failure to submit the affidavit on time.[16]  By reason of the affidavit including new material submitted after the summary judgment hearing without sufficient explanation for its lateness, this court cannot find the circumstances here provide an adequate reason to consider the Baranowski affidavit for the purpose of deciding the motion for summary judgment.

The Duley deposition, however, presents a different scenario.  Plaintiff is not asking this court for permission under Rule 56(f) for time for "depositions to be taken," FED. R. CIV. P. 56(f), but is only asking for permission to submit a deposition that had been previously taken and was in possession of defendants.  The Duley deposition also presents a closer case because its admission presents little danger of prejudice to the defendants.  Unlike the majority of the situations where the district court denied late filed materials, the deposition here involves material that is not a surprise to defendants.  The defendants' counsel were aware of the substance of the deposition since they took the deposition on March 21, 2005, one and one-half years before the October 19, 2006 summary judgment hearing.

---

[16] This court explicitly directed plaintiff's counsel to explain the reason why this court should consider any new materials.  Defs.' Resp. to Pl.'s Supp. Br., Ex. A at 7, 36-37, 44, 53-54 (summary judgment transcript).

Plaintiff's intention to rely on  Duley in some fashion at the summary judgment stage was also apparent from plaintiff's insertion of the unsworn statement in his initial Response, although this court rejected that statement as inadmissible for deciding the motion for summary judgment.  Pl.'s Resp. to Defs.' Concise Statement of Facts, Ex. I. Unlike the situation with the Baranowski affidavit, plaintiff's counsel attempted to submit the deposition during the summary judgment hearing.  See L.D. Woods, 373 F.2d at 734. This court granted defendants an opportunity to respond to the submission of the Duley deposition in their response to plaintiff's supplemental brief.  Finally, the Duley deposition also presents evidence that is clearly material to this court's proper disposition of this case.  This court will exercise its discretion to consider the Duley deposition for the purpose of deciding the motion for summary judgment.  The parties should not view this exercise of discretion as permission to disregard the deadlines ordered by this court. A party who needs an extension of time to comply with a deadline ordered by this court must seek an extension; otherwise, that party risks adverse consequences.

## II. FACTUAL BACKGROUND

### A. Defendants' backgrounds

At the time of the shooting defendant Samuel J. Nassan, III was twenty-nine years[17] old.  Defs. App., Ex. 1 (Samuel J. Nassan III  Nassan Deposition ("Nassan Dep."))

_____

[17]Defendant Nassan testified during his deposition that he was twenty-nine years old on the date of incident – December 24, 2002.  The record, however, reflects that he was born in April 1972.  Nassan Dep. at 7.  Thus, on the date of incident he was actually thirty years old.

at 7 (Mar. 2, 2005).  He had been a trooper with the Pennsylvania State Police at the

Uniontown station for approximately six months.  Id. at 56.  He began his service there in

July 2002 after attending the State Police Academy.  Id.  Prior to joining the state police

he had a long history of military service, serving a little over eight years in active service

and two years of inactive service in the Marines.  Id. at 46.  He initially joined the

Marines in 1992, two years after graduating from high school.  Id. at 29-30.  After

bootcamp, he became a member of the military police, id. at 38-39, and served as an

active military patrolman for about three years, although he retained the title throughout

his time of service.  Id. at 53.  He moved up in rank until he was promoted to the rank of

staff sergeant, E-6, a promotion he did not accept because he resigned from active service

as of November 10, 2000, to seek a position with the state police.  Id. at 45-46, 51-52.

Defendant Nassan has long been familiar with firearms.  Id. at 40.  He has been

hunting since the age of nine, id. at 40, continues to hunt year round in Pennsylvania, id.

at 41, and owns over twenty guns.  Id. at 41-42.  While in the Marines, he distinguished

himself as an expert marksman, serving as a sniper and sniper instructor and competing

on behalf of the Marine Corps in pistol and rifle matches.  Id. at 42-43.  He also received

urban sniper training and training in urban close quarter combat, id. at 44, and became an

instructor in those areas.  Id. at 45.  As an instructor, he "traveled around training local,

state and federal law enforcement agencies" on the "use of force, SWAT training and

sniper training" and "wrote an eight-hour block of instruction on . . . [the] use of force

and less lethal force for the military who is still currently using it." Id. at 62-63.  He

testified that, despite this expertise, prior to the incident in question, he never was

required to discharge his weapon in anything other than a firing range situation.  Id. at 52.

He testified, however, that he had been required to draw his weapon while on duty as a

military police officer and in his regular police duties.  Id. at 52-53.

Defendant Nassan weighed 260 pounds at the time of the shooting.  Id. at 158.  He

has lifted weights and agreed that he is a gym rat.  Id. at 33.  While in the Marines he

entered "minor" weightlifting competitions and proudly asserted that he was able to

power lift 500 pounds.  Id. at 103.  At the time of the shooting he was not competing, but

continued to lift weights at a local gym.  Id. at 104.  Defendant Nassan testified that he

also took several different types of protein supplements and had been doing so for eight to

nine years.  Id. at 37-38, 101-02.  Defendant Nassan also testified that while in the

Marines, when he weighed only 245 pounds, he was able to run three miles in

approximately twenty or twenty-one minutes.  Id. at 36.

Unlike defendant Nassan, defendant Curry does not have any certifications in

special weapons areas.  See Defs.' App., Ex. 2 (Deposition of Juan Curry ("Curry Dep"))

(March 3, 2005) at 42-44.  At the time of his deposition, over two years after the

shooting, defendant Curry was stationed at the Uniontown station of the Pennsylvania

State Police.  Id. at 12.  As of the same time, he testified that he had worked at that station

for seven to eight years and had been a trooper for ten years.  Id.  Defendant Curry was

28

thirty-two years old at the time of the shooting.  See Id. at 14.  Born and raised in Uniontown, he attended the United States Navel Academy for less than a year before transferring to Penn State University, which he left in his junior year in 1991 for personal reasons.  Id. at 14-19.  At Penn State University he played football for one season as a strong safety, but did not start.  Id. at 17.  After working for two or three years unloading trucks for UPS, he was hired as a state trooper on July 24, 1994.  Id. at 21-24.  While serving as a trooper, he received training in accident reconstruction and worked as an accident reconstructionist.  Id. at 25-27.  Prior to the incident here, defendant Curry had never attempted to shot anyone nor had he been shot.  Id. at 24-25.

Prior to the incident here, defendants Nassan and Curry were not well acquainted. Nassan Dep. at 67-68, 117; Curry Dep. at 41-42.  They had not worked regularly with each other and, as far as defendant Nassan could recall, had never previously responded to a scene together.  Nassan Dep. at 67-68, 117; Curry Dep. at 41.  Defendant Nassan said "I mean I didn't even know the guy that well" and "I just knew him from seeing him around the barracks."  Nassan Dep. at 110.  Defendant Curry did note, however, that he thought they may have encountered each other in some capacity when working on the same accident the day before the incident in question.  Curry Dep. at 41-42.

**B. The initial chase**

On December 24, 2002, defendants Nassan and Curry were at the Uniontown station working the day shift, which ended at 3:00 p.m.  Nassan Dep. at 90-91; Curry

Dep. at 51-52.  They were both doing paperwork when a call came in that there was a

fight at the Uniontown  Mall.  Nassan Dep. at 91-92, 100; Curry Dep. at 51-52.

Defendant Nassan testified that he did not want to take his own car to the scene because it

was unmarked and difficult to recognize, so he got into defendant Curry's car since it was

the first car that came by as he was leaving the station.  Nassan Dep. at 92-93, 109-10;

Curry Dep. at 53.  When defendants reached the mall the situation had cleared up and

they did not enter the mall.  Nassan Dep. at 93.

At approximately 2:14 p.m. while defendants were still in the mall parking lot,

they received a call that a stolen vehicle described as an older brown Ford Bronco had

been seen in the City of Uniontown.  J.S. ¶ 1; Nassan Dep. at 117, 119; Curry Dep. at 54-

55.  Defendants Nassan and Curry decided that the stolen vehicle would most likely be

found in the Lemonwood or Lemonwood Acres area because stolen cars seen in the city

are often recovered in that area.  Nassan Dep. at 118-19; Curry Dep. at 57-58, 60.  They

immediately headed towards that area, and began traveling north on Cleveland Avenue.

Nassan Dep. at 120; Curry Dep. at 60.  When they had driven less than ten blocks on

Cleveland Avenue, they encountered a brown Ford Bronco (the "Bronco") matching the

description of the stolen vehicle emerging from a side alley and appearing to attempt to

turn onto Cleveland Avenue.  Nassan Dep. at 121-22; Curry Dep. at 61.  Both defendants

testified that the driver of the vehicle appeared to be attempting to turn left onto

southbound Cleveland Avenue in front of the defendants' northward bound police car.

Nassan Dep. at 121-22, 124; Curry Dep. at 61.  Defendant Nassan testified that he

reached this conclusion because the wheels on the Bronco were turned to the left.  Nassan

Dep. at 124-25.

Both vehicles stopped close to each other.  The defendants' marked car was

perpendicular to the Bronco and the right fender of defendants' vehicle made a right angle

with the Bronco's left fender.  J.S. ¶ 3.  Both defendants observed a black male driving

the car, but were not able to determine whether anyone else was in the vehicle.  Nassan

Dep. at 124; Curry Dep. at 61-62.  Defendant Curry testified that he thought he saw a

black male driving the car who "looked to be a teenager," i.e., "fifteen through nineteen,"

but was unable to tell anything else about the driver's appearance from defendant Curry's

vantage point.  Curry Dep. at 61-62.  Defendant Nassan testified that he could see a black

male from the shoulders up from his vantage point looking slightly up at an angle at the

driver.  Nassan Dep. at 122-23.  He stated that the driver was sitting up, but he could not

tell how tall he was.  Id. at 122.

Defendant Nassan got out of the police car, drew his weapon, and approached the

driver's side of the Bronco with his weapon pointed at the driver.  J.S. ¶ 6; Nassan Dep. at

131.  As he exited the police cruiser, defendant Nassan made loud verbal commands to

the driver such as "Let me see your hands, stop, let me see your hands, State Police, let

me see your hands."  J.S. ¶ 7; Nassan Dep. at 140.  Defendant Nassan approached within

ten feet of the car and testified that he observed the driver looking at him with a blank

expression.  Nassan Dep. at 132-33.  As defendant Nassan approached, both defendants observed the driver moving the gearshift in an apparent attempt to shift gears.  Nassan Dep. at 130, 133; Curry Dep. at 64.  The driver accelerated the Bronco in reverse down the alley behind him.  J.S. ¶ 8; Curry Dep. at 64.  As the driver backed down the alley, he hit the side of a house multiple times, scraping it as he drove, drove through a yard, hit a tree, and ran over a 'WATCH CHILDREN' sign.  J.S. ¶ 10; Curry Dep. at. 65.  After driving approximately 100 yards, the driver ran over a chain link fence and the Bronco came to a stop with its back end resting on the fence.  Nassan Dep. at 145; Duley Dep. at 31.  Defendant Nassan testified that, after the Bronco had begun to move, he got back into the police cruiser, holstering his gun as he did so.  Nassan Dep. at 144; J.S. ¶ 9. Defendant Curry confirmed that defendant Nassan got back into the police cruiser at some point and the defendants, while in the police cruiser, followed the Bronco as it reversed down the alley.  Curry Dep. at 64.  Defendants came to a stop almost bumper to bumper with the Bronco.  J.S. ¶ 11; Curry Dep. at 65-66.

The defendants' testimony of what happened at this point differs from that of Duley.  The defendants assert, after both cars came to a stop, and while defendant Curry was attempting to call the police station, defendant Nassan opened his door, drew his weapon, began moving toward the Bronco to execute an arrest, and yelled verbal comments such as "State police, let me see your hands, state police, don't move, let me

see your hands."  Nassan Dep. at 146; Curry Dep. at 66–68; J.S. ¶ 12.[18]  Defendant

Nassan testified that, while still shouting verbal orders, he observed a suspect in the

driver's seat of the Bronco looking at him with a blank expression on his face.  Nassan

Dep. at 148; J.S. ¶ 14.  Defendant Nassan stated that the suspect looked "indifferent"

during the chase and "had no fear in his face."  Nassan Dep. at 193.  Defendants allege

that the suspect exited the driver's side door of the Bronco and immediately began to run.

J.S. ¶ 15.  The suspect ran toward Edgemont Drive down another alley called Prospect

Street which ran perpendicular and to the right of the alley that the stolen Bronco had just

driven down.  Id.  The suspect who exited the car was later identified as Michael Ellerbe

("Ellerbe").[19]  Id.  Ellerbe was 5'2" and weighed 100 pounds.  Pl.'s App., Ex. B. at 2.  At

---

[18] Duley's testimony appears to contradict defendant Nassan's claims that he repeatedly warned the suspect to stop and show his hands because Duley stated that he did not hear defendants say anything during the chase.  Pl.'s Suppl. Br., Ex. A. (Melvin Duley Deposition ("Duley Dep.")) at 52. When asked whether he heard defendants "give any orders to stop running to" the suspect, Duley replied "I didn't hear them say nothing [sic]."  Id. at 55.  But, Duley's statement must be taken in the context of his earlier explanation why he did not hear defendants or the suspect say anything when the chase began: "I couldn't hear because of the window."  Id. at 33.

[19] Plaintiff argues that although Ellerbe began running at some point, "defendants are unable to establish conclusively that Michael Ellerbe was driving the subject Bronco."  J.S. ¶ 15 (plaintiff's response).  Plaintiff suggests that Ellerbe may have climbed into the front seat from the back seat.  J.S. ¶ 18.  Plaintiff, however, only supports this contention with material that this court has found to be inadmissible for the purpose of deciding the motion for summary judgment. See, e.g., J.S. ¶ 4 (plaintiff's response).  Regardless, Duley's statements do not contradict defendants' statements that Ellerbe exited the driver's side of the Bronco once it had stopped.  Duley Dep. at 31-32.

the time, he was twelve years old.  See Defs.' Br. in Support of Motion to Dismiss (Doc. No. 7) at 1.

When Ellerbe began to run, defendant Nassan testified that he was within fifteen feet of him or a little closer and did not see a weapon at that time.  Nassan Dep. at 150-51, 155.  Defendant Nassan initially testified that, although "I probably could have took [sic] a couple steps and grabbed him – " he did not do so because "I think I was more shocked that he got out and ran than anything."  Id. at 157.  Defendant Nassan explained, "If I draw – and generally when I draw my gun on somebody, I'm 260 pounds, people either stop – if they're going to make a move, they're making a move because something bad's going on, they might have a weapon."  Id. at 158.  Defendant Nassan, however, later testified that he did not grab Ellerbe because "[h]e might have had a weapon, and he was too fast."  Id. at 178.  Defendant Nassan testified that he did not grab him when he was within two steps of him "[b]ecause I thought he was armed."  Id.  This somewhat corresponded to his prior testimony at the inquest that, as Ellerbe was exiting the car, "I was close enough that if I would have taken approximately two steps, I could have probably grabbed him.  If I could have seen his hands . . . .  I would have taken those two steps and grabbed him right out of that vehicle."  Defs.' App., Ex. 4 (Coroner's Inquest, Afternoon Session ("Inquest") at 211.

Duley testified in his deposition that the chronology of events was  different from that recounted by the officers.  He stated that Ellerbe "wrecked the car into the fence and

34

got out of the car." Duley Dep. at 32. He agreed that as Ellerbe "was outside the car looking up the street," the police car then approached. Id. Two policemen got out of the car and began to chase Ellerbe down the alley. Id. According to Duley's testimony, defendant Nassan's short standoff with Ellerbe did not occur.

Once the foot chase began, defendant Nassan testified that Ellerbe "pulled away initially" before Nassan determined how to respond to his actions. Nassan Dep. at 167-68. But, a few short moments later, once Ellerbe was about thirty or forty feet in front of him, defendant Nassan gave chase. Id. at 167-68, 182-84. Defendant Curry testified that he got out of the police car and began to chase Ellerbe at about the same time that Nassan began chasing Ellerbe, although "they both have the jump on me." Curry Dep. at 73. Ellerbe ran down Prospect Street followed by defendant Nassan, with defendant Curry slightly behind and all of them reached a full out sprint. Curry Dep. at 74; Nassan Dep. at 166, 194; J.S. ¶¶ 19-20.

Ellerbe turned right onto Edgemont Drive and began running west towards Cleveland Avenue. J.S. ¶ 22. Nassan slowed, hoping to cut a corner when he encountered an indentation in a fence and, as he did so, Curry passed him. J.S. ¶¶ 21, 23; Curry Dep. at 74. Defendant Nassan testified that he stopped at the indentation because he hoped to be able to cut the corner and intercept Ellerbe as he turned right onto Edgemont Drive, but a privacy fence prevented him from doing so. J.S. ¶ 21. Defendant Nassan further testified that he was worried that taking the corner blindly would be

dangerous because of the tactical advantage it would give to Ellerbe if he had a weapon and that he yelled at defendant Curry to take the corner wide for the same reason. Nassan Dep. at 197-98.  Defendant Curry took the corner wide onto Edgemont Drive.  Id at 201-02.  With defendant Nassan slightly behind defendant Curry, defendants chased Ellerbe up Edgemont Drive towards Cleveland Avenue, closing the distance with Ellerbe as he approached Cleveland Avenue.  Nassan Dep. at 195; Duley Dep. at 52.  Ellerbe ran across Cleveland Avenue, across a yard, and onto a driveway, with defendant Curry about twenty feet behind Ellerbe and defendant Nassan behind defendant Curry.  Nassan Dep. at 209, 217; Duley Dep. at 43-44.  Ellerbe ran down a  driveway, which was at 61 Cleveland Avenue, and into the property's backyard.  J.S. ¶ 33.  He vaulted the four-foot-high fence at the rear of the yard, landing in the backyard of 68 Murray Avenue.  J.S. ¶ 34.  Defendant Nassan agreed that it was possible that this entire chase covered approximately 110 yards and only lasted longer than half a minute.  Nassan Dep. at 191-92.

## C.  The parties' actions during the foot chase

The parties dispute Ellerbe's actions as he ran, as well as the officer's responses and the impression they received from Ellerbe's actions.  The parties primarily dispute whether Ellerbe put his right hand into his pocket during the pursuit and ran with a blading motion looking back over his right shoulder or whether he ran like a sprinter with his arms pumping throughout the entire chase.

36

Defendant Nassan testified that Ellerbe's hands were going "in and out" of his pocket "a few times" "[t]hroughout the course of the chase."   Nassan Dep. at 164, 203. He asserted that, as a result, "I thought he had something in his pocket, and he was holding onto something."  Id. at 163.  Defendant Nassan initially testified in his deposition that when Ellerbe exited the car he could only see his right hand, which was moving "like as in running."  Id. at 161- 62, 165.  When asked which hand Ellerbe had in his pocket, he testified, "I believe it started with the left hand the whole time.  I know the right hand went into his pocket or it left my view at least once during the pursuit, but his left hand was definitely in his pocket."  Id. at 162.  He explained that  he noticed for the first time that Ellerbe was running with his left hand in his pocket when he initially was directly behind Ellerbe who was at a distance of about thirty or forty feet.   Id. at 165.

During Nassan's deposition, plaintiff's counsel referred him to his testimony at the Inquest after the shooting.  Id. at 169.  At the Inquest, defendant Nassan had testified: "Upon exiting the vehicle, though, he landed, kind of landed on the fence.  I remember seeing him stumbling.  The ironic thing was he had his hand in his pocket, in his right pocket, the whole time.  He come [sic] out of the vehicle with his hand in his pocket." Defs. App., Ex. 4 at 210 (Inquest).  After plaintiff's counsel referred defendant Nassan to his Inquest testimony, Nassan changed his testimony to agree with his statements at the Inquest.  He stated that Ellerbe had his right hand in his pocket, and defendant Nassan testified that it was the left hand that he could not see, from the moment he exited the

Bronco.  Nassan Dep. at 169-71.  At his deposition, upon being confronted about the confusion about which hand he could see and which hand was in Ellerbe's pocket, defendant Nassan testified "I can't recall.  I can't recall accurately.  It was two years ago."  Id. at 188.  He also stated that he could not accurately recall if Ellerbe's left hand was in his pocket at any point during the chase.  Id. at 188-89.  Defendant Nassan testified that as he chased the suspect down the alley he continued to scream things such as  "[l]et me see your hands" and "[g]et your hand out of your pocket."  Defs.' App., Ex. 4 at 212-13 (Inquest).

Defendant Curry testified that Ellerbe put his hand in his pocket two or three times during the chase.  Curry Dep. at 78.  He testified that each time Ellerbe did so he put it in for "a couple of seconds" and then took it out.  Id. at 87.  Defendant Curry agreed with defendant Nassan's later testimony that Ellerbe put only his right hand in his pocket, noting that it was "always the right hand."  Id. at 142-43.  At the beginning of defendant Curry's deposition, he disclosed that he had discussed the issue of which hand Ellerbe had in his pocket with defendant Nassan after defendant Nassan's deposition the day before.  Id. at 10-11.  He explained, "I just remember one thing he had mentioned about he made a statement about – asked about hands or something like that, that he had inadvertently said the wrong hand.  He said he was just caught up in the movement, the first thing that came to his mind that he said left when he meant to say right."  Id. at 11.

Defendant Nassan testified that when Ellerbe began running he was "blading," which meant that he was turning his body at an angle.  Nassan Dep. at 164.  He explained that Ellerbe began running with his body turned sideways so that his right shoulder was back and, as Ellerbe did so, he kept looking back at defendant Nassan.  Id. at 166.  Defendant Nassan testified that he considered Ellerbe's actions threatening behavior, and considered blading "a defensive position."  Id. at 187-88, 191.  He explained that "[w]hen you blade your body shows me that there's a possibility that you can reach around and throw something, shoot, anything you need to do at that point."  Id. at 187-88.  He stated that, although Ellerbe did not run the entire 110 yards of the chase blading, he did blade "continuously" during the chase.  Id. at 207.  He explained, "[Ellerbe] blades and then runs straight and then blades.  He continued to blade."  Id. at 207.  Defendant Nassan stated that despite Ellerbe looking back over his shoulder and having his hand in his pocket, Ellerbe was "running fast."  Id. at 166-67.  Finally, when asked about Duley's description of Ellerbe as "pumping his hands to run," defendant Nassan sharply disagreed.  Id. at 203.  He testified that he could not recall if Ellerbe's hands were pumping when they were out of his pocket and stated his disagreement with Duley's testimony that Ellerbe was pumping his hands to run, stating:  "I witnessed it, his hands were not pumping."  Id. at 203-04

Defendant Curry, however, contradicted defendant Nassan's statements with respect to the running motions of Ellerbe.  He testified that Ellerbe was pumping his arms

at some points during the chase.  Curry Dep. at 77, 86.  He stated that Ellerbe ran with his

arms pumping whenever he did not have his hand in his pocket.  Id. at 87.  Defendant

Curry testified that he was "pretty much" looking "squarely" at Ellerbe's back for most of

the chase, except when Ellerbe was veering or making a turn.  Id. at 87.  Defendant Curry

was also asked, "did [Ellerbe] turn and look over his shoulder at any time that you

recall?"  Id. at 164.  He replied, "That I can recall today, I don't remember him looking

back over his shoulder, I can't recall that today."  Id.  Duley testified that he saw Ellerbe

look over his shoulder as Ellerbe approached Cleveland Avenue.  Duley Dep. at 41.

Duley, however, contradicted defendant Nassan by testifying that Ellerbe ran with his

arms moving up and down in a pumping motion.  Duley Dep. at 35.

　　　There is a factual dispute regarding when defendants drew their service revolvers.

Defendant Nassan testified that he drew his weapon before the chase began when he got

out of the police car to attempt to execute a felony arrest.  Nassan Dep. at 131; J.S. ¶ 12.

He further testified that he thought he holstered the gun during the chase once defendant

Curry passed him because he was concerned about a "cross-fire situation."  Nassan Dep.

at 211-12.  Although he was not sure, he also thought that he again unholstered his

weapon after crossing Cleveland Avenue:  "I want to say it was in the yard when we

appeared to be gaining control of the chase."  Nassan Dep. at 213.  He was sure, however,

that when defendant Curry was trying to take the fence his own gun was either  already

out or he was in the process of drawing it.  Id. at 241.  Defendant Curry agreed that

40

defendant Nassan exited the vehicle when they first encountered Ellerbe in the alley, but could not recall if defendant Nassan pulled his gun at that point, Curry Dep. at 67-68, and could not describe when Nassan holstered and unholstered his gun during the chase because he testified that he lost sight of defendant Nassan after passing him early in the chase. Id. at 91.

Defendant Curry testified that he took out his own service revolver as they were running when he first saw Ellerbe "with his hands in his pocket" and heard defendant Nassan tell him to get his hands out of his pants. Id. at 84-85. He thought he did so while running down the first alley towards Edgemont Drive. Id. at 84-85. Defendant Nassan, however, was unable to recall whether or not defendant Curry's weapon was out at any time during the chase, including the part of the chase when defendant Curry was in front of him. Nassan Dep. at 212. Defendant Nassan testified that he was not aware that defendant Curry's weapon had been out until "after the whole incident." Id. at 212.

Duley's testimony sharply contradicted both defendants' statements. He testified that he observed the defendants as they were running down the initial alley and turned onto Edgemont Drive and stated, at that point, they did not have anything in their hands. Duley Dep. at 34.[20] He further testified that both defendants did not have their guns out

---

[20] Duley testified that Ellerbe and defendants were out of Duley's view for a short period of time. Duley Dep. at 42. Duley's testimony indicates that he lost sight of them for a short period as they turned onto Edgemont Drive and regained sight of them by moving to another window just prior to Ellerbe's crossing Cleveland Avenue. Id. at 34, 42-43, 46.

when he saw them toward the end of Edgemont Drive and that neither defendant had his gun drawn prior to jumping the fence at the end of the chase.  Id. at 48-49.  Duley stated that defendant Curry drew his gun after jumping the fence, but was unable to see if defendant Nassan drew his gun.  Id.

The parties dispute whether either defendant in fact believed Ellerbe had a weapon on the basis of the facts described above as well as the statements of defendants.  Nassan testified that he feared that Ellerbe might have a weapon "the whole time."  Nassan Dep. at 174.  He testified that from what he saw "I  thought that he had something in his pocket, and he was holding onto something."  Id. at 163.  Yet, defendant Nassan also agreed that he never saw anything that looked like a weapon at any time during the chase. Id. at 156.  He also testified that when Ellerbe was "blading" he did not make any "threatening gestures" or draw any weapon.  Id. at 207.  Defendant Curry likewise testified that he was concerned that Ellerbe had a weapon because he put his hand in his pocket while he was running, Curry Dep. at 77-78, and that he drew his weapon because he saw Ellerbe with his hands in his pocket, heard defendant Nassan yell "get your hands out of your pants" and was concerned that Ellerbe had a weapon.  Id. at 84-85.  He also agreed, however, that he did not see anything that looked like a weapon during the chase. Id. at 89.

Defendant Nassan testified that, although he was worried that it was a busy neighborhood, Nassan Dep. at 217, he did not see any vehicles moving during the chase, nor did he observe any pedestrians or anyone else in the area.  Id. at 216-17.  Duley

42

similarly testified that he did not observe anyone else in the area during the chase until after the shooting.  Duley Dep. at 50-51.  Defendant Curry also did not recall seeing any moving cars in the area.  Curry Dep. at 136.

### D. The shooting

The parties dispute nearly all of the material aspects of the final events leading up to the shooting, which occurred after Ellerbe entered the backyard of 61 Cleveland Avenue and jumped the fence.

#### 1. Defendants' account

The defendants' description of the shooting is as follows.  According to defendants, as Ellerbe approached the fence, both defendants had their guns drawn.  Nassan Dep. at 213; Curry Dep. at 84-85.  With defendants chasing him, Ellerbe vaulted the four-foot high fence and landed in the backyard of 68 Murray Avenue.  J.S. ¶ 34.  Using both his hands as leverage, Ellerbe completely cleared the fence.  Curry Dep. at 89-90.  Defendant Nassan testified that after Ellerbe jumped the fence "[h]e landed in a stumble . . . [k]ind of like almost hitting the ground, but his legs still going."  Nassan Dep. at 219.  He explained that despite the slight stumble Ellerbe never really broke his stride as he continued to run across the yard.  Id. at 219.

As Ellerbe jumped the fence, defendant Curry followed directly behind him and attempted to jump the fence with his gun in his right hand.  Nassan Dep. at 231-32; Curry Dep. at 94; J.S. ¶ 36.  As he did so, he was at his closest to Ellerbe, within maybe two or three feet of Ellerbe.   Curry Dep. at 75-76.  Defendant Curry testified that he did not see

a weapon in Ellerbe's hands at the fence, id. at 90-91, but was not able to describe Ellerbe's actions as he landed because defendant Curry was focused on jumping the fence. Id. at 115.  He also testified that he was unaware of defendant Nassan's exact location because he had lost sight of defendant Nassan after passing him earlier in the chase.  Id. at 91-93.

Defendant Curry testified that, although he thought he reached for his holster in an attempt to holster his gun, he abandoned the effort because he did not have time before he reached the fence.  Id. at 140-41.  He said that as he approached the fence and attempted to negotiate it with his gun in his right hand, the barrel of the gun in his right hand was pointed downward and at an angle to his right and behind him and away from Ellerbe.  Id. at 93; J.S. ¶ 40.  He explained, because he could not "get the push off of the fence" that he needed, he began to go over the fence in "[m]ore of a rollover" fashion.  Curry Dep. at 94.  As his left knee and foot went over the fence, his pants snagged on the fence somewhere near his inner thigh and ripped.  Id. at 95, 98; J.S. ¶ 41.  His tie also snagged on the fence and was later found on the fence after the incident.  Curry Dep. at 142. Defendant Curry testified, after the snag, that he did not get stuck on the fence but instead "just continu[ed] to roll over the fence onto the other side and land on my left knee."  Id. at 95.

As defendant Curry rolled over the fence, but before he landed on his knee, he heard a bang and his gun went off.  Id. at 96.  Although he was unsure of his exact position when the gun discharged, defendant Curry was sure that he was at the top of the

44

fence when it happened.  Curry Dep. at 96-97.  He testified that he did not fire the gun

himself, but the top of the fence caused the gun to go off.  Id. at 99.  He explained that the

top of the metal fence had metal V's, which he called "serrations."  Id. at 99-100.  He

testified that as he moved over the fence he believes that one of the serrations protruded

into the trigger guard of his weapon, causing the trigger to pull.  Id. at 99-100, 119-20;

J.S. ¶¶ 38-39.  He also testified that, although the barrel of the gun in his right hand was

pointed downward and at an angle behind him when he began to go over the fence, Curry

Dep. at 93, the angle changed slightly as he went over.  Id. at 126-28.  He explained,

"When I looked – when I heard bang the first time I looked down at [his gun] – when I

looked at it specifically I heard bang and I saw it here [indicating], it was on the straight

. . . along the fence."  Id. at 127-28.  Defendant Curry testified that he later told

investigators to look around the garage at the side of the fence, which would have been in

front of him and not behind him, for signs of the bullet from his gun because he recalled

seeing the gun pointed down the fence line and to the right of him.  Id. at 126-28.

Defendant Curry was convinced that his bullet was not discharged toward Ellerbe,

but either went sideways down the fence or behind him.  Id. at 129.  Defendant Curry

further testified that when his gun went off he could not see what Ellerbe was doing and

could only see him "peripherally" out of the corner of his eye.  Id. at 102.  As defendant

Curry landed on his left knee, he placed his left hand out to balance himself.  Id. at 103.

He testified that a couple of seconds after he landed he heard another bang.  Id. at 103-04,

108, 114.  Unsure where the bang came from, he instinctively looked to his left and saw

Ellerbe fall forward in a diving motion.  Id. at 104-06.  He stated that Ellerbe fell face-

first into the ground and slid a "couple feet."  Id. at 110-12.  He thought that Ellerbe came

to a stop approximately fifteen to twenty feet from defendant Curry, although it could

have been slightly farther.  Id. at 109-12.

Defendant Nassan explained the events from his viewpoint.  He testified that, as

defendant Curry approached the fence, defendant Nassan was back and to the right of

defendant Curry.  Nassan Dep. at 226.  He explained that as Ellerbe ran toward the end of

the driveway and entered the backyard of 61 Cleveland Avenue he "bellied" far to his left

and then back to his right, with defendant Curry following almost directly in his path,

although "on the inside" of Ellerbe.  Id. at 224.  Defendant Nassan speculated that Ellerbe

initially veered left to avoid a dog called "Hater" nearby and veered farther left because

he considered scaling another fence before realizing it was too high.  Id. at 225-27.

Defendant Nassan testified that he ended up to the right of defendant Curry and Ellerbe

because, although they all bellied around the dog "a little bit," id. at 225, as he followed

he did belly out to the left as far as the other two and ended up to their right.  Id. at 227.

Defendant Nassan further testified that when defendant Curry went over the fence and his

gun went off defendant Nassan's own gun was either already out or he was in the process

of drawing it.  Id. at 241.

Defendant Nassan testified that as Ellerbe went over the fence, defendant Curry

was "pretty close" to Ellerbe, id. at 250, and although he never took his eyes off Ellerbe,

defendant Curry obstructed defendant Nassan's view at some point so that he could only

see Ellerbe's head and "maybe the shoulder area." Id. at 245-46. He explained that as Ellerbe landed on the other side of the fence and stumbled Ellerbe continued to run away from the fence at an angle to the right. Id. at 220, 231. Defendant Nassan's view was still obstructed at this point. Id. at 245. Nassan explained, "Once [Ellerbe] crossed the fence Curry was – we were like ducks in a row." Id. at 246. As defendant Curry went over the fence, defendant Nassan heard a shot. Id. at 242. He believed defendant Curry had been shot because of "[t]he way he slumped and fell over the fence, the way his face looked – he's a black man, his face was pale white, just the whole totality of the circumstances." Id. at 248.

After the initial shot, Ellerbe ran "[a] few steps maybe," covering "[n]ot even half the yard." Id. at 242. As Ellerbe ran, defendant Curry slid over the fence and his body cleared Nassan's field of vision. Id. at 247. Defendant Nassan testified that he could see Ellerbe to the right of defendant Curry and fired his gun toward him. Id. at 247. When defendant Nassan fired, Ellerbe was a few steps to the right of defendant Curry. Id. at 247. Defendant Nassan also testified that when he fired Ellerbe had run about halfway across the yard and was approximately twenty to twenty-five feet from defendant Nassan and about ten to fifteen feet from the fence. Id. at 220, 237-38. Defendant Nassan was not sure of his exact position when he fired, id. at 241, but testified that he was "still moving, coming to a stop," id., and "was probably just getting to a stop when I squeezed the trigger." Id. at 245.

When asked to explain why he fired, defendant Nassan explained that he could not see Ellerbe's left hand because Ellerbe's right side was towards him, so he thought it was possible that Ellerbe took a weapon from his left side and fired at defendant Curry.  Id. at 251.  Defendant Nassan also testified that it did not occur to him that his partner's gun went off.  Id. at 252.  He testified that after he fired Ellerbe "immediately fell to the ground and slid Superman style."  Id. at 252.  Defendant Nassan continued to cover Ellerbe and yelled at defendant Curry to "check [himself], where are you hit, I'll call for an ambulance, where are you hit?"  Id. at 257.  Defendant Curry responded "I don't think I'm hit," started checking himself, and said "I'm not shot, he's shot."  Id. at 257-58.  Defendant Nassan believes he responded "I know, I shot him."  Id. at 258.

Defendant Nassan testified that he approached Ellerbe and "holstered my gun, did a quick pat-down on him to make sure there were no other weapons on him, and that's when I flipped him over."  Id. at 258.  Defendant Nassan then used his cell phone to call for emergency personnel.  Id. at 257; J.S. ¶ 55.  According to the Troop B Washington Audio Logger Transfer Log, less than two minutes had elapsed from the time defendants Nassan and Curry had first encountered the Bronco.  Id. at 257; J.S. ¶ 56.  Defendant Nassan testified that during this time Ellerbe never pulled anything out of his pockets and defendant Nassan did not see anything that looked like a weapon.  Nassan Dep. at 156; Defs.' Ex. 9 at 254.

Defendant Nassan immediately tried to cover the exit wound on Ellerbe with his hand to stop the bleeding and tried to get Ellerbe to wake up.  Id. at 255.  He also yelled to civilians, asking them to waive down an ambulance.  J.S. ¶ 58.  The first police officers responding to the scene arrived less than one minute after the shooting occurred.  J.S. ¶ 59.  When they arrived at the scene, they had to pull defendant Nassan away from Ellerbe.  J.S. ¶ 60.  Ellerbe was taken to Uniontown Hospital and pronounced dead at 2:55 p.m.  J.S. ¶ 62.

Within minutes after the shooting, at least twenty-two state and local police officers and medical personnel were at the scene.  J.S. ¶ 61.  Among the first responders were state police who immediately initiated an investigation.  J.S. ¶ 65.  During the investigation that followed, numerous officers and civilians were interviewed.  J.S. ¶ 74.  Two .40 caliber Smith and Wesson shell casings were recovered at the scene.  J.S. ¶ 76.  Ballistics tests attributed one of the casings to each officer's gun.  J.S. ¶ 77.  The shell casing attributed to defendant Curry was recovered in the backyard of 68 Murray Avenue, inches from the fence.  J.S. ¶ 79.  The other shell casing, attributed to defendant Nassan, was recovered in the backyard of 61 Cleveland Avenue.  J.S. ¶ 78.  The post-incident inspection of each trooper's service weapon concluded that all other rounds were accounted for.  J.S. ¶ 75.

After the shooting, defendant Curry testified that he was only at the scene for about five to ten minutes.  Curry Dep. at 130.  He spoke to investigators for a few minutes

and gave a brief synopsis of what had transpired.  Id. at 131.  He was not searched at the scene and was not wearing a backup gun at the time, nor does he ever do so.  Id. at 131. Corporal Dennis Ulery accompanied defendant Curry back to the barracks and accompanied him through the rest of the barracks that day.  J.S. ¶ 68.  At the barracks, defendant Curry turned in his service weapon, ammunition, and ripped trousers.  J.S. ¶ 70.  Defendant Curry was not sure when he was given a replacement gun and could not recall whether he was given a temporary replacement gun prior to being given the replacement gun that he had at the time of his deposition.  Curry Dep. at 132.

Similarly, Trooper Frank Ryan took defendant Nassan back to the barracks and stayed with him for the rest of his stay at the barracks that day.  J.S. ¶ 67.  Defendant Nassan also was able to leave the scene of the shooting with his weapons.  He turned in his service weapon and ammunition after arriving at the barracks.  J.S. ¶ 69.  He was immediately given a replacement weapon. Nassan Dep. at 280.  Defendant Nassan had also been carrying a backup revolver that day in a holster under his arm.  Id.  The revolver used the same ammunition as his service revolver.  Id. at 269. The backup weapon was not taken from him at that time.  Id. at 280-82.  The backup weapon was not turned in and taken for ballistic testing until about two weeks before defendant Nassan's deposition – well over two years after the shooting.  Id. at 283.

Defendants allege that the cause of Ellerbe's death was "a bullet wound which entered Ellerbe's back, slightly right of the center line."  J.S. ¶ 63.  They assert that the

"bullet moved slightly upward and leftward and exited his chest slightly left of the center line." Id. A second grazing wound was situated in the front of the upper left arm. Pl.'s App., Ex. C. at 4. (Affidavit of Werner U Spitz, M.D.). Defendants' assert that this wound was a superficial grazing wound caused by the same bulled that caused Ellerbe's death. J.S. ¶ 64. In Ellerbe's pockets investigators found $1.12 in U.S. currency, three Pokemon cards, a 4 Roses small pocket knife, a Bobs Auto & Body phillips screw driver, and an unknown red substance in a vial. Defs.' App., Ex. 9 at 122 (Report of Tpr. P.C. Leary). No weapon was found on his person. Id.

### 2. Plaintiff's account

Plaintiff disputes almost all the material aspects of the defendants' description of the shooting. He primarily disputes the defendants' allegation that defendant Curry accidentally discharged his gun.

Duley's recount of the shooting is dramatically different than defendants' account. Duley testified that after Ellerbe jumped the fence "the two cops jumped the fence, one at a time" with defendant Curry jumping first, followed by defendant Nassan. Duley Dep. at 47. He further testified that defendant Curry had no "trouble" jumping the fence. Id. at 48. He explained that defendant Curry "pulled his gun out" after jumping the fence, but he could not see if defendant Nassan "drew his weapon or not" after jumping over the fence. Id. at 48-49 (emphasis added). Duley explained what happened next in response to a series of questions:

Q.      What happened next?

A.      Then Michael Ellerbe – there is a fence right here
        (indicating), and there are garages here (indicating).  He was
        trying to head for this fence (indicating).

Q.      Could we make that fence No. 3.

A.      When he got like right there (indicating), they shot like two
        times.  I don't know if he hit the ground or not.  Then he was
        about to jump, and then they shot him.

Q.      Who is they?

A.      Him, the colored cop.

Q.       Now, how many shots were fired in all?

A.      Three.

Q.      How many shots did the white cop fire?

A.      None.

Q.      Did you ever see the white cop take out his gun?

A.      No. I only saw the black cop do his.

Id. at 49-50.

Plaintiff also provided the sworn affidavits of two witnesses who testified that they

heard three shots.  Witnesses Veronica Campbell and Barbara Jackson both testified that

they heard three gunshots at the time of the shooting.  Pl.'s App., Exs. N (Campbell

Affidavit) ¶ 4; P (Johnson Affidavint) ¶ 3.

Prior statements made by defendant Nassan to Sergeant Baranowski shortly after the shooting also somewhat contradict defendant Nassan's later version of the shooting. Defs.' App., Ex. 9 at 43 (Sergeant J.E. Baranowski Report).  Sergeant Baranowski explained their conversation in his report: "At that time Trooper Nassan approached me and stated: 'I shot him, he [sic] just a kid.'  'I thought he had shot Curry and I ordered him to stop and take his hands out of his pocket.  He refused and I shot him once.'"  Id.

Plaintiff disputes defendant Curry's statement that his gun was pointed either behind him or down the line of the fence when it fired.  Plaintiff refers to defendant Curry's contradiction of his deposition statements made in an account he gave at the scene shortly after the shooting, as reported by Trooper Scott D. Myers.  Defs.' App., Ex. 9 at 21 (Trooper Scott D. Myers Report).  Trooper Myers explained that before defendants left the scene he approached defendant Curry when defendant Curry was speaking to Sergeant Baranowski.  Id.  He gave the following account of what he heard:  "Trooper CURRY was explaining where he believed his discharged round went when he discharged his weapon. Trooper CURRY stated he believed his weapon was pointed upward and thought his round went over the garage roof inside the crime scene."  Id.

53

The expert testimony of David E. Balash, a firearms examiner/forensic science consultant, also contradicts defendant Curry's account.  Pl.'s App. Ex. D.  (Affidavit of David Balash).[21]  Balash reached the following conclusions:

> 2.  All evidence viewed by this examiner indicated that the fence did not cause Trooper Curry's weapon to fire, rather that the trigger was functioned by Trooper Curry's trigger finger.

> 3. The undersigned is of the opinion that if Trooper Curry positioned his weapon on the fence as he indicated to investigators and in his deposition, several things should have taken place to wit, The [sic] weapon should have been damaged by the fence material in the process of firing, the weapon probably would not have ejected the fired cartridge case or a stovepipe situation would most likely have happened, a new cartridge would not have been placed in the chamber and Trooper Curry would most likely have suffered a hand injury from the functioning of the slide.

> 4. The fact that these things did not occur leads to my conclusion that trooper [sic] Curry's gun did not accidentally discharge as a result of being placed on top of the fence.

> 5. . . . The trigger travel on this weapon is between 1/2"-1" and the trigger must be held in the most rearward position for the firing pin to move forward.  Therefore, the weapon would not only have to have an obstruction get into the trigger guard and engage the trigger, this obstruction also would have to move the trigger over ½ an inch while being pressured by the hand of Trooper Curry when he is attempting to navigate the fence. This did not happen in my opinion based on the evidence.

Pl.'s App., Ex. D. at 4-5. [2]2

---

[21] This court ruled on defendants' challenges to plaintiff's expert testimony at a hearing on May 18, 2006.  (Doc. No. 66).  This court will refer to expert testimony in accordance with those rulings.

[22] Defendants challenge David Balash's testimony with respect to the cause of the discharge of defendant Curry's gun.  J.S. ¶¶ 37, 38, 40, 48, 65 (defendants' replies).  Defendants assert, "Balash's opinion testimony regarding whether the fence caused Trooper Curry's to discharge is inadmissible due to lack of requisite professional certainty and lack of evidentiary

Dr. Werner Spitz, another expert, opined that the location of the bullet wound on Ellerbe's arm and its size and shape were consistent with having been caused by a second shot and that Ellerbe's back must have been "almost completely squared to the shooter. Pl.'s App., Ex. C. at 4.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Id. at 322. Once that

---

foundation. . . . Further, Balash cannot and does not opine that the location of Curry's cartridge was inconsistent with an accidental discharge as Trooper Curry described." J.S. ¶ 38. Defendants' counsel raised this precise issue at the hearing on expert evidence on May 18, 2006. Motion in Limine Hearing Transcript at 33-35. This court explicitly held the challenged opinions admissible. Id. at 32-35.

burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  An issue is "material" if it may affect the outcome of the matter pursuant to the underlying law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Id.</u> at 249.

## IV. DISCUSSION

Defendants move for summary judgment with respect to all seven claims brought by plaintiff, which includes claims brought pursuant to 42 U.S.C. § 1983 for the use of excessive force in violation of the Fourth Amendment (count I) and a claim brought pursuant to 42 U.S.C. §§ 1983 and 1985(5) for conspiracy after the shooting to deprive Ellerbe of his constitutional rights to due process, equal protection, and privileges and immunities (count II).  Plaintiff also brings various state law claims, including intentional torts of gross negligence, willful and wanton misconduct, assault and battery, and intentional infliction of emotional distress (count III).  Counts VI and VII raise the same state law claims in the context of wrongful death and survival actions and counts IV and

V present wrongful death and survival actions under 42 U.S.C. § 1983 and state law.[23]
The court will first consider the federal claims and then the state law claims.

## A. Federal Claims

### 1. Section 1983 claims – Counts I and II

Plaintiff asserts claims against defendants pursuant to 42 U.S.C. §§ 1983, 1985(3)
for the use of excessive force and for the participation in a conspiracy to deprive Ellerbe
and the persons of his estate of their constitutional rights.

Section 1983 provides a remedy against "any person" who, under the color of state
law, deprives another of his constitutional rights.  A prima facie case under section 1983
requires a plaintiff to demonstrate that a person deprived him of a federal right and that
the person who deprived him of that right acted under color of state or territorial law.
Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Both parties agree
that defendants acted under color of state law.  See  Compl. at ¶¶ 3-4; Defs.' Br. in Supp.
of Motion to Dismiss at 4-10.  Defendants, however, have moved for summary judgment
on the grounds that there are no genuine issues of material fact with respect to these
claims and that, as a matter of law, they did not deprive Ellerbe of his constitutional

---

[23]  Plaintiff initially sued defendants in their individual and official capacities.  Plaintiff,
however, conceded that his claims against defendants can only be against defendants in their
personal capacities by reason of the claims against defendants in their official capacities being
barred by sovereign immunity.  See Memorandum Order at 2 (Doc. No. 18) (Entered March 22,
2004).

rights.  They also argue that they are entitled to qualified immunity with respect to the claim for excessive force.

### a.  Unreasonable seizure/excessive force

In count I of the complaint, plaintiff alleges that defendants violated Ellerbe's rights under the Fourth and Fourteenth Amendments to be free from the unreasonable search and seizure of his person and from the use of excessive or deadly force which occurred when defendants discharged their weapons without cause or justification in Ellerbe's direction as he was running away.

Claims of excessive force are analyzed under the Fourth Amendment.  Rodriguez v. Passaic, 730 F. Supp. 1314, 1320 (D. N.J. 1990).  "'[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigation stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" In re City of Philadelphia Litig., 49 F.3d 945, 962 (3d Cir.1995) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).  Therefore, plaintiff's claim here will be analyzed under the Fourth Amendment standard.

A claim for excessive force must involve a "seizure" that was unreasonable.  Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).  The reasonableness standard under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting

arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "Other factors include 'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" Couden v. Duffy, 446 F.3d 483, 497 (3d Cir. 2006) (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997)).

Further, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. The reasonableness finding should allow

> for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation.

Id. at 397.

Defendants first contend that, with respect defendant Curry, there is no evidence that he unlawfully "seized" Ellerbe. Defs. Br. in Supp. of S.M.J. at 6. "[A] suspect is not seized until he submits to the police's authority or the police subject him to some degree of physical force." Abraham v. Raso, 183 F.3d 279, 291 (3d Cir. 1999). A person is "seized" when he is shot. Abraham, 183 F.3d at 288; see Garner, 471 U.S. at 7

("apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Here, Michael Ellerbe was not seized until he was shot.

Defendants argue that plaintiff cannot identify enough evidence to show that defendant Curry fired his weapon towards Ellerbe or that the bullet from defendant Curry's gun struck Ellerbe. Defs.' Br. in Supp. of S.M.J. at 9. They specifically argue that plaintiff cannot dispute that the positioning of the shell casings was consistent with defendant Nassan's testimony that after defendant Nassan cleared the fence he fired one shot at Ellerbe and that plaintiff cannot even show it is possible that defendant Curry's weapon was pointed toward Ellerbe when discharged. Id. at 9-10. Defendants also argue that, even if this court finds "that there is a dispute of fact regarding whether Trooper Curry's bullet struck Ellerbe, this dispute is not material because plaintiff has no evidence to challenge Trooper Curry's testimony that his gun went off accidentally." Defs.' Br. in Supp. of S.M.J. at 6; see Troublefield v. City of Harrisburg, 789 F.Supp. 160, 164 (M.D. Pa.1992) ("It makes little sense to apply a standard of reasonableness to an accident."). The court, however, concludes that viewing the disputed facts in the light most favorable to plaintiff, the nonmoving party, there are genuine issues of material fact with respect to these matters.

First, there is a genuine issue of material fact with respect to the direction in which defendant Curry's gun was discharged and his intent when discharging his weapon.

Defendant Curry statements were contradicted when he told Trooper Myers that shortly after the incident that he thought his gun was pointed upward when it fired, yet he testified in his deposition that it was point straight along the fence line.  Duley also testified that defendant Curry unholstered his gun after jumping the fence and fired his gun toward Ellerbe.  He testified there were three shots, all fired by defendant Curry, not the one shot  defendant Curry claimed.  Two other witnesses also testified that they heard three shots fired.  Plaintiff's expert David Balash opined that defendant Curry's gun could not have gone off accidentally in the manner he described.  This information places defendant Curry's credibility in question.  A reasonable juror could conclude defendant Curry's testimony was not credible and determine that he intentionally fired his gun towards Ellerbe.[24]

Plaintiff also created a dispute of fact with respect to whether or not a bullet from defendant Curry's gun struck Ellerbe.  Dr. Werner Spitz opined that the location of the bullet wound on Ellerbe's arm and its size and shape were consistent with having been caused by a second shot.  A reasonable trier of fact could agree with plaintiff's experts and, in light of the conclusion that defendant Nassan fired directly at Ellerbe, determine that one of the two bullets that struck Ellerbe was from defendant Curry's gun.

---

[24] A reasonable juror could conclude that defendant Curry fired his gun more than once. Although Duley testified that defendant Curry fired three times, he also testified that he could not see whether defendant Nassan had his gun out.  Thus, a reasonable juror could also conclude that one or two of the shots Duley heard were in fact from defendant Nassan's gun, especially in light of defendant Nassan's admission that he shot Ellerbe in the back and in light of the evidence indicating that defendant Nassan's gun was fired.

It is immaterial that plaintiff has not directly contradicted defendants' evidence with respect to the location of the shell casing.  The United States Court of Appeals for the Third Circuit has noted:

> [S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story – the person shot dead – is unable to testify." . . .  "[T]he court may not simply accept what may be a selfserving account by the officer.  It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably."

Abraham, 183 F.3d at 294 (internal citation omitted) (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)).  In Abraham, the court concluded that the jury could reasonably disbelieve the self-serving statements of the security officers regarding the location of the shooting officer, despite apparently contradictory physical evidence.  Id.  The court noted that, while the trajectory of the bullet may "rule out that [the officer] was behind the vehicle, it hardly precludes a jury from finding that [the officer] fired from somewhere along the front side of the vehicle."  Id. at 293-94.  The court concluded that a jury could reach that conclusion, by "[c]onsidering the physical evidence together with the inconsistencies in the officer's testimony. . . ."  Id. at 294.  That evidence and inconsistencies created credibility questions and "credibility determinations should not be made on summary judgment."  Id.

Likewise here, the inconsistencies in defendant Curry's testimony and the physical evidence referred to by the experts have created questions as to the credibility of his

statements.  Like in <u>Abraham</u>, although the position of the shell casings may be consistent with defendant Curry's testimony, the jury could come to a different conclusion with respect to how the casings reached their final position.  The shell casing that defendants identify as belonging to defendant Curry was found just inside the fence in the backyard of Murray Avenue.  Duley testified that defendant Curry fired from inside that backyard. The jury could reasonably conclude that defendant Curry's shell casing ejected in that direction.

When viewing the facts in the light most favorable to plaintiff, a jury could find that defendant Curry jumped the fence, intentionally fired his gun at least once in Ellerbe's direction, and hit Ellerbe with one bullet from his gun.  Thus, plaintiff raises a question for the jury to decide regarding whether defendant Curry unreasonably seized Ellerbe.

Defendants also argue that defendant Nassan's use of force was objectively reasonable in light of the circumstances surrounding the chase.  Defendants argue that the circumstances of the initial chase gave defendant Nassan reason to believe that Ellerbe was dangerous and that defendant Nassan reasonably believed that Ellerbe had shot defendant Curry.  Defs. Br. in Supp. of S.M.J. at 11-13.

Defendant Nassan's explanation of the shooting is placed in dispute because he relied on defendant Curry's statements that he accidentally discharged his gun. Defendant Nassan's factual allegation that when he shot Ellerbe he could only see

63

Ellerbe's right side from where he was positioned is placed in question by the opinion of Dr. Spitz that Ellerbe's back must have been "almost completely squared to the shooter." Pl.'s App., Ex. C. at 4. Duley testified that he did not see defendant Nassan with his gun in his hands before defendant Nassan jumped the fence into the backyard of 68 Murray Avenue. He also testified that shots were not fired until after defendant Nassan jumped the fence. A reasonable juror could conclude based upon this evidence that defendant Nassan's explanation of the actual shooting was not credible.

Plaintiff also placed in dispute defendant Nassan's stated belief that during the chase Ellerbe was armed and dangerous. There is record evidence of a reasonable dispute of fact with respect to whether or not defendant Nassan had his weapon drawn during the chase, whether Ellerbe placed his hand in his pocket during the chase, and whether Ellerbe "bladed" during the chase.

First, Duley contradicted defendant Nassan's assertions that he exited the police cruiser and drew his weapon early in the chase. Duley's testimony indicated that Ellerbe began to flee from the Bronco before defendant Nassan exited the police cruiser. Duley thus contradicts defendants' assertions that Ellerbe ignored the commands of the much larger defendant Nassan despite defendant Nassan pointing his weapon directly at Ellerbe. Duley's testimony also contradicted defendant Nassan's statements that he had his gun drawn and fired his gun before entering the backyard of 68 Murray Avenue. Second, during his deposition, defendant Nassan changed his story with respect to when he first

64

saw Ellerbe's hands in his pocket and which hand was in his pocket.  Although defendant

Curry corroborated defendant Nassan's second account with regard to which hand was in

Ellerbe's pocket in his deposition, he did so after defendant Nassan explained his

mistake.[25]  Third, both Duley and defendant Curry contradicted defendant Nassan's

statements that Ellerbe was not running with his hands in a pumping motion.  Fourth,

defendant Curry contradicted defendant Nassan's statements that Ellerbe was continually

"blading" during the chase by stating that he could not recall Ellerbe blading and by

stating that Ellerbe's back was squarely facing defendant Curry for most of the chase.

Finally, neither defendant saw Ellerbe with a weapon during the chase.

The above evidence of record raises credibility questions that must be determined

by the jury with respect to the truth of defendant Nassan's statements.  Viewing the

disputed evidence in the light most favorable to plaintiff, the nonmoving party, a

reasonable trier of fact could conclude that Ellerbe did not place his hand in his pocket or

blade during the chase, and that defendant Nassan did not have his weapon drawn at the

beginning of the chase.

When the evidence in dispute is taken in the light most favorable to the plaintiff,

the following facts are presented for this court's reasonableness determination: When

defendants encountered the stolen Bronco, defendant Nassan exited his car and with his

---

[25] Defendant Nassan, however, also testified at the Inquest that Ellerbe's right hand was
in his pocket. Defs.' App., Ex. 4, 177.

gun drawn ordered the driver to exit the vehicle.  The driver reversed the Bronco down

the alley behind him, hitting numerous objects.  Defendants followed the Bronco.  The

Bronco came to a stop after running over a fence and Ellerbe stepped out of the car from

the driver's side door.  Ellerbe was twelve years old at the time, was 5'2", and weighed

110 pounds.  As the police car approached, Ellerbe began to run and the defendants got

out of the car and began to chase him with defendant Nassan in the lead.  As they chased

him, defendant Nassan commanded him to stop.  Defendant Curry passed defendant

Nassan as defendant Nassan attempted to cut off Ellerbe.  Defendant Curry chased

Ellerbe up Edgemont Drive and into the backyard of 61 Cleveland Avenue.  As Ellerbe

approached Cleveland Avenue, he looked back over his shoulder once and then continued

to run.  Ellerbe jumped the fence into the backyard of 68 Murray Avenue.  Defendant

Curry followed him over the fence, drawing his gun as he did so.  Defendant Nassan then

followed defendant Curry over the fence.  Ellerbe continued to run across the yard with

his back towards defendants.  Before Ellerbe could reach the other side of the yard,

defendant Curry fired his weapon at Ellerbe, hitting him in the arm.  Defendant Nassan

fired his gun at Ellerbe, hitting him in the back and killing him.

　　　In light of the above disputed facts reviewed in the light favorable to plaintiff, the

defendants' actions in shooting Ellerbe cannot be considered objectively reasonable.  The

Supreme Court addressed the proper reasonableness standard for the use of deadly force

in Tennessee v. Garner, 471 U.S. 1 (1985), where it concluded that "[i]t is not better that

all felony suspects die than that they escape."  Id. at 11.  The Court concluded that

"[w]here the suspect poses no immediate threat to the officer and no threat to others, the

harm resulting from failing to apprehend him does not justify the use of deadly force to

do so."  Id.  The Court stated, however, that  "[w]here the officer has probable cause to

believe that the suspect poses a threat of serious physical harm, either to the officer or

others, it is not constitutionally unreasonable to prevent escape by using deadly force."

Id.

       The holdings of the Supreme Court in Garner and Graham provide the following

test for reasonableness when deadly force is used: "Giving due regard to the pressures

faced by the police, was it objectively reasonable for the officer to believe, in light of the

totality of the circumstances, that deadly force was necessary to prevent the suspect's

escape, and that the suspect posed a significant threat of death or serious physical injury

to the officer or others?"  Abraham, 183 F.3d at 289.  The use of force will be objectively

reasonable "if the suspect threatens the officer with a weapon or there is probable cause to

believe that he has committed a crime involving the infliction or threatened infliction of

serious physical harm" and deadly force is needed to prevent escape.  Garner, 471 U.S. at

11-12.

       Courts have found an officer's use of deadly force reasonable where the

circumstances provided a sound reason for the officer's belief that the suspect posed a

significant threat of injury to the officer.  In Thompson v. Hubbard, 257 F.3d 896 (8th

67

Cir. 2001), the court held that it could not find that excessive force was used as a matter of law based upon an officer's uncontradicted account of a shooting of a fleeing suspect. Id. at 898.  In that case, Thompson fled from an officer who reasonably suspected that he had been involved in an armed robbery.  Id.  The foot chase that followed ended when Thompson ran between two buildings and climbed over a short fence.  Id.  According to the officer's testimony, "Thompson got up from the ground, looked over his shoulder . . . and moved his arms as though reaching for a weapon at waist level."  Id.  While his back was towards the officer and his hands obscured, the officer yelled "stop."  Id.  When Thompson continued to move, the officer shot him in the back.  Id.  Thompson was found to be unarmed.  Id.  The court found that a jury could not conclude that the officer's use of deadly force was objectively unreasonable.

Similarly, in Billingsley v. City of Omaha, 277 F.3d 990 (8th Cir. 2002), the court found that a jury could conclude that an officer had probable cause to shoot an unarmed suspect who fled the site of a burglary despite being told to halt three times.  Id. at 993. In that case, the officer approached the suspect with his weapon drawn while the suspect was committing a burglary in a house.  Id. at 992.  The officer told him that he was a police officer and ordered him to halt and put his hands up.  Id.  Although the officer could see that the suspect had a purse in his left hand, he could not see his right hand.  Id. The suspect ignored the officer's warning and ran out of the room and onto a deck.  Id. The officer ran to the deck and again issued a warning. Id.  The suspect then jumped off

the deck and onto the ground, fifteen feet below.  Id. at 994.  As the suspect landed in a

crouched position, he turned and rotated his shoulder.  Id. at 992, 994. The officer then

shot him in the lower right back.  Id.  The suspect was found to be unarmed and the

officer did not observe a weapon during the short chase.  Id.  The court nevertheless

denied the plaintiff's motion for judgment as a matter of law and found that "the jury

could properly draw the inference of an immediate threat of death or serious bodily harm

to [the officer] from his inability to observe [the suspect's] hand and his shoulder

movement."  Id. at 995.

Both Thompson and Billingsley involved circumstances where the officers had

reason to believe that the suspect had committed a felony and was dangerous and where

the officers fired in response to a perceived direct and immediate threat or injury.  Similar

to those cases, defendants here had reason to believe that Ellerbe was fleeing the scene of

a felony.  Unlike the situations addressed in those decisions, however, defendants here –

viewing the disputed facts in the light favorable to plaintiff – did not fire in response to a

direct and immediate threat of serious physical harm.  In Thompson the officer had reason

to believe that the suspect was armed because he was believed to have fled from the scene

of an armed robbery.  Thompson, 257 F.3d at 898.  The officer also perceived a direct

threat when Thompson moved his hands towards his waist and did not stop when

commanded.  Id.  In Billingsley, the officer could not see the suspect's right hand and

perceived a direct threat when the suspect rotated his left shoulder towards him.

Billingsley, 277 F.3d at 994.  Here, on the other hand, viewing the disputed facts in the

light favorable to plaintiff, defendants had no reason to believe that the 5'2", 110 pound

Ellerbe was armed, nor did they perceive an immediate threat to themselves or anyone

else when they fired.  Based upon the facts viewed in favor of plaintiff, defendants could

see both of Ellerbe's hands at the time of the shooting and he did not make a sudden

motion of any kind that placed them in fear of injury.  Defendants did not fire at Ellerbe

in response to any immediate action, but simply fired at him while he was running from

them with his back to them.

Under those facts, even if defendants felt threatened by Ellerbe's initial flight in

the Bronco, they still cannot show that they were justified in shooting him solely to

prevent his escape.  Even when threatened, an officer is only justified in shooting as long

as it is objectively reasonable for him to think that he or another is in peril.  Abraham, 183

F.3d at 294.  "A passing risk to a police officer is not an ongoing license to kill an

otherwise unthreatening suspect."  Id.  Thus, an officer may not be justified, for example,

in continuing to shoot at a fleeing suspect driving a car after the officer is out of harms

way, unless the suspect poses such "a serious threat to others, that the officer could

justifiably use deadly force to stop the suspect's flight even after the officer escaped out

of harm's way."  Id. 294-95; see Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 2003)

("When an officer faces a situation in which he could justifiably shoot, he does not retain

the right to shoot at any time thereafter with impunity.").

In this case, as Ellerbe jumped the fence, defendant Curry was able to see that he did not have any weapon in his hands.  Curry Dep. at 90-91.  Defendant Nassan also testified that nothing occurred at the fence line to change his opinion about Ellerbe's threat level.   Nassan Dep. at 233.  Thus, based upon the facts viewed in the light favorable to plaintiff, Ellerbe did not do anything different to signal to Nassan that he was placing either defendant in *immediate* danger of serious harm.  Moreover, defendant Nassan testified:

> Q.     I want to make sure that at no point at this fence line did you see Michael Ellerbe take any action which you considered to be offensive action; is that right?
>
> A.     Correct.
>
> Q.     So when you fired you had not seen him take any offensive action?
>
> A.     I did not.

Id. at 249-50.

Thus, this situation is far more closely aligned to that in Tennessee v. Garner, where an officer chased a suspect from the scene of a burglary.  Garner, 471 U.S. at 3. The fleeing suspect stopped at a chain link fence at the edge of a backyard.  The officer could see his hands and tell that he was unarmed.  When the suspect did not respond to commands to halt and began to climb over the fence, the officer shot him in the back of the head to prevent him from eluding capture.  Id. at 4.  The officer testified that he was "reasonably sure" that the suspect was unarmed and thought he was seventeen or eighteen

years old and about 5'5" or 5'7" tall.  Id. at 3-4.  The suspect was in fact fifteen years old, was 5'4" tall and weighed between 100 and 110 pounds.  Id. at 4.  The Supreme Court held that the officer "did not have probable cause to believe that [the suspect], whom he correctly believed to be unarmed, posed any physical danger to himself or others."  Id. at 20.  The Court emphasized that the officer had "no articulable basis to think" that the suspect was armed, nor could he reasonably have believed that the "young, slight, and unarmed" suspect posed a threat.  Id. at 20-21.  The mere fact that the suspect committed the serious crime of nighttime burglary did not serve to show that he was sufficiently dangerous for the force used.  Id. at 21.

Like in Garner, defendants, viewing the disputed facts in the light favorable to plaintiff, here had no articulable basis to believe that Ellerbe was armed and dangerous.  The fact that Ellerbe fled from the scene of a crime, first in the car, and then on foot did not in itself indicate that the slight Ellerbe presented any danger to the experienced 260-pound defendant Nassan and defendant Curry.  As in Garner, the disputed facts viewed in the light favorable to plaintiff indicate that defendants shot Ellerbe simply to prevent his escape.  The Supreme Court's opinion in Garner has clearly indicated that kind of action is unacceptable.

Nor does this case fall under the rubric of decisions where the officers were justified in shooting a suspect because they reasonably believed that he presented an immediate threat to others.  See, e.g., Scott v. Edinburg, 346 F.3d 752, 759 (7th Cir. 2003)

(holding that an officer's conduct in fatally shooting the driver of a car was objectively reasonable where, at the time the shots were fired, the driver had attempted to run the officer over and was attempting to escape at a high rate of speed through a gas station parking lot with twelve to fourteen bystanders in it).  Defendants, viewing the disputed facts in the light favorable to plaintiff, could not have reasonably believed that Ellerbe presented an immediate threat to others.  They had no articulable basis to believe he was armed.  Moreover, defendant Nassan testified that, although he was worried that it was a busy neighborhood, Nassan Dep. at 216, he did not see any vehicles moving during the chase, nor did he observe any pedestrians or anyone else in the area.  Id. at 216-17.  Duley similarly testified that he did not observe anyone else in the area during the chase until after the shooting.  Duley Dep. at 50-51.  Defendant Curry also did not recall seeing any individuals or moving cars in the area at the time of the shooting.  Curry Dep. at 136. Thus, defendants could not have reasonably believed that Ellerbe presented an immediate threat of harm to the public.

Accordingly, when the factual disputes are viewed in favor of plaintiff, the court concludes that there are sufficient facts upon which a jury may find that defendants used excessive force in violation of the Fourth Amendment by shooting Ellerbe in the back while he attempted to flee.

### b. Qualified immunity

Defendants assert that summary judgment should be granted in their favor on plaintiff's claims for excessive force because they are entitled to qualified immunity. The Supreme Court recognized that suits against state officials are another way of suing a state. Hafer v. Melo, 502 U.S. 21, 25 (1991). When sued in their personal capacities, state officers or officials, however, come to court as individuals. Id. at 27. A state official, when sued as an individual, fits within the statutory term "person" under 42 U.S.C. § 1983. Id.

The privilege of qualified immunity recognizes the balance between the need for a forum to vindicate the abuse of federal rights and the "substantial societal costs" entailed in opening government officials to suit for the discretionary exercise of their public duties. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). The United States Supreme Court resolved these competing concerns "by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987); Acierno v. Cloutier, 40 F.3d 597, 615 (3d Cir.1994) ("[T]here is a compelling need for such a protective doctrine because of the severe chilling effect numerous suits for damages would have on prospective officials. . . .").

74

An objective inquiry is required into the reasonableness of the actions of government officials that permits government officials to anticipate when their conduct may give rise to liability for damages.  Anderson, 483 U.S. at 645-66.  The privilege affords "protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, law enforcement officials who 'reasonably but mistakenly' conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity."  Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir.1997)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)). When it attaches, the privilege of qualified immunity "is an immunity from suit rather than a mere defense to liability" which is lost if defendants are permitted to go to trial.  Saucier v. Katz, 533 U.S. 194, 200-01 (2001).  Once qualified immunity is asserted by a defendant, the plaintiff has the burden of demonstrating the privilege should not attach.  McLaughlin v. Watson, 271 F.3d 566, 570 (3d Cir. 2001).

An analytical framework was developed to test whether a defendant is entitled to qualified immunity. Under this framework, the inquiry into the claim of qualified immunity is distinct from the inquiry into the merits of the claim.  Saucier, 533 U.S. at 197.  First, the court must determine whether the facts, taken in a light most favorable to the plaintiff's allegations, show that the defendants' conduct violated a federal right or constituted a constitutional violation.  Id. at 201. In determining this first step, the court

should "set forth principles which will become the basis for a holding that a right is clearly established." Id.

If a federal right would be violated based upon a plaintiff's allegations, the court must move to the next step: whether the federal right alleged to be violated was clearly established to a degree of particularity within the specific context of the case at issue. Id. A broad and generalized declaration that a clearly established federal right was violated is insufficient. Anderson, 483 U.S. at 640. For example, in Anderson, the Supreme Court determined that for purposes of applying the qualified immunity privilege, the simple assertion that the Fourth Amendment prohibits warrantless searches without probable cause and exigent circumstances was not enough to demonstrate that the defendants' conduct violated a "clearly established" right under the particular facts of that case. Id. at 640-41. Instead, the Court stated that, in order for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id.

If a rule requiring particularity was not in place, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Id. at 639. The net effect would be to transform "a guarantee of immunity into a rule of pleading." Id . Thus, for the second prong of the framework, a right is "clearly established" where "it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." Saucier, 533 U.S. at 202.  The exact action in question, however, need not have been held unlawful, but, rather, "in light of the preexisting law the unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. 635, 639 (1987).  The officers must have received "fair warning" that their conduct was unconstitutional.  Hope v. Pelzer, 536 U.S. 730, 740-41 (2002).

If the court determines that a review of the particular context demonstrates that the rights alleged to have been violated have been "clearly established," the court reaches the third and final step in the analytic framework: "whether a reasonable official should have known that the alleged action violated the plaintiffs' rights."  Doe v. County of Centre, Pa., 242 F.3d 437, 454 (3d Cir. 2001).

The Supreme Court of the United States instructs that determining whether a right was clearly established depends, in large degree, on the degree of particularity within the specific context of the case at issue.  See  Saucier, 533 U.S. at 199-202. Other courts have noted that a public official is considered to have constructive knowledge of established law.  Cannon v. City & County of Denver, 998 F.2d 867, 874 n.6 (10th Cir. 1993). In addition, the Supreme Court has instructed lower courts to apply all precedents within their knowledge in deciding the issue of qualified immunity.  Elder v. Holloway, 510 U.S. 510 (1994).

As noted above, Tennessee v. Garner has long made it clear that an officer may not shoot an unarmed fleeing suspect unless he has probable cause to believe the suspect

poses a serious threat of harm or has committed a violent crime and deadly force is needed to prevent escape.  <u>Garner</u>, 471 U.S. at 11-12 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); <u>see</u> <u>Harris v. Roderick</u>, 126 F.3d 1189, 1203 (9th Cir.1997) ("Examining [the decedent's] actions from the perspective of a reasonable law enforcement officer faced with the need to make on-the-spot decisions, it is plain to us that his actions were not objectively reasonable.  <u>Graham</u>'s totality of the circumstances test does not permit the use of deadly force to kill a suspect who is running [away from the officer] and who makes no threatening movement of any kind, even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers."); <u>Marley v. City of Allentown</u>, 774 F. Supp. 343, 345-46 (E.D. Pa.1991) (not objectively reasonable to use deadly force by unleashing a trained attack dog to apprehend a fleeing unarmed misdemeanant who one could reasonably conclude posed no threat to the officer).

　　As noted above, there are genuine issues of material fact with respect to whether Ellerbe posed a threat of injury to defendants when they shot him.  This court concludes, after viewing the disputed facts in the light favorable to plaintiff, that it was clearly established at the time of the shooting that it was a violation of the Constitution for defendants to shoot a fleeing, unarmed suspect in the back to prevent escape when it was unreasonable for defendants to believe the suspect was armed or made any offensive

gestures towards defendants.  Further, under the same set of facts, this court concludes that it would be clear to a reasonable officer that the conduct was unlawful.  This is an obvious case – viewing the disputed facts in the light favorable to plaintiff – that does not fall in "the 'hazy border between excessive force and acceptable force.'"  Brousseau v. Haugen, 543 U.S. 194, 201 (2004) (quoting Saucier, 533 U.S. at 206).  The unlawfulness of the defendants' actions should have been apparent to them in light of the existing law. See Casteel v. Pieschek, 3 F.3d 1050, 1053 (7th Cir. 1993) ("[D]efendants' conduct is so patently violative of the constitutional right that reasonable officials would know" it was unreasonable.).

### 2. Conspiracy claims – Count II

In count II of the complaint, plaintiff alleges conspiracy claims under 42 U.S.C. §§ 1983 and 1985(3).  Plaintiff alleges that after the shooting the defendants conspired amongst themselves to deprive Ellerbe and the persons of his estate of the constitutional rights to due process, equal protection of the laws, and equal privileges and immunities.[26] Plaintiff alleges that the record evidence shows a deliberate attempt by defendants to cover up the true version of the events surrounding the shooting.  Plaintiff also alleges that, because the inconsistencies in the defendants' testimony along with the forensic evidence shows that defendants acted willfully and without probable cause in using

_____

[26] Plaintiff's complaint included claims against unidentified officers.  Plaintiff has not named any officers or continued to pursue claims against those officers.

deadly force to seize Ellerbe, defendants clearly conspired in an attempt to deprive

Ellerbe of his constitutional rights and hide the true nature of the shooting.  Id. at 23.

Defendants argue that plaintiff cannot assert a section 1985(3) claim because he

has not provided evidence that the defendants' actions were in any way motivated by race

or  a section 1983 conspiracy claim because he has not shown any evidence of an

agreement between defendants to deprive Ellerbe of his constitutional rights.  Defendants

also argue that plaintiff cannot assert a claim for conspiracy based upon constitutional

violations that occurred after Ellerbe died.

### a. Conspiracy under section 1985(3)

To establish a claim for a conspiracy under section 1985(3), plaintiff must show:

"(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed

to deprive, directly or indirectly, any person or class of persons to the equal protection of

the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or

property or the deprivation of any right or privilege of a citizen of the United States."

Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997) (citing United Broth.of Carpenters &

Joiners of America, Local 610 v. Scott, 463 U.S. 825 (1983)).  Plaintiff has not pointed to

any evidence showing that the defendants' actions were motivated by racial animus, nor

does the record provide any support for that proposition.[27]  Plaintiff has provided

---

[27] At the most, defendant Nassan admitted in response to plaintiff's counsel's question, "Now, Lemonwood's a black neighborhood" that the Lemonwood neighborhood where defendants went to search for the stolen Bronco is "a low-income neighborhood, it's

evidence whereby a reasonable juror could conclude that defendants shot an unarmed,

nondangerous fleeing twelve-year-old suspect in the back to prevent him from escaping.

That evidence in itself, however, does not show that the actions of either defendant were

motivated by racial animus.  Therefore, this court concludes that no reasonable trier of

fact could render a verdict for plaintiff on the section 1985(3) claim and will grant the

defendants' motion for summary judgment on plaintiff's claim in count II with respect to

a conspiracy under section 1985(3).

### b.  Conspiracy under section 1983

To establish a claim for conspiracy under section 1983, plaintiff need not show

invidious discrimination.  Bell, 746 F.2d at 1205.

> A civil conspiracy is a combination of two or more persons acting in
> concert to commit an unlawful act, or to commit a lawful act by unlawful
> means, the principal element of which is an agreement between the parties
> to inflict a wrong against or injury upon another, and an overt act that
> results in damage.

Id. at 1255 (quoting Rotermund v. United States Steel Corp., 474 F.2d 1139 (8th

Cir.1973)) (internal quotations omitted)(citation omitted in original).

> A plaintiff must make specific factual allegations of combination,
> agreement, or understanding among all or between any of the defendants to

---

predominantly black, yes." Nassan Dep. at 118.  This response in itself does not provide proof
of racial or class-based animus.  Further, the Supreme Court has made clear that section 1985(3)
was not "intended to reach conspiracies motivated by bias towards others on account of their
economic views, status, or activities."  United Broth. of Carpenters and Joiners of America,
Local 610 v. Scott,  463 U.S. 825, 837 (1983).  In addition, defendant Nassan testified about use
of the "N-word" when he was growing up and later.  Id. at 84-90.  There was no evidence,
however, that he used racial slurs on the job or in connection with the incident in question.  Id.

plot, plan, or conspire to carry out the alleged chain of events.  Only
allegations of conspiracy which are particularized, such as those addressing
the period of the conspiracy, the object of the conspiracy, and certain other
action of the alleged conspirators taken to achieve that purpose will be
deemed sufficient.

Panayotides v. Rabenold, 35 F. Supp. 2d 411, 419 (E.D. Pa. 1999) (quoting Dutton v.

Buckingham Township, No. CIV.A.97-3354, 1997 WL 732856, at *2 (E.D. Pa. Nov.13,

1997)) (internal citations and quotations omitted).  "It is not enough that the end result of

the parties' independent conduct caused plaintiff harm or even that the alleged

perpetrators of the harm acted in conscious parallelism."  Id.

### (i) Insufficient evidence of conspiracy adduced

Plaintiff did not provide any direct evidence of an agreement between defendants

to commit a wrong nor of an overt act that resulted in damage.  Plaintiff only relies here

on an argument that the evidence taken in the light most favorable to him indicates that

defendants' account of the circumstances surrounding the shooting is a fabrication.

Plaintiff did not provide any evidence to prove his allegations in the complaint[28] and show

---

[28] Plaintiff alleged, inter alia, that

> At the scene of their crime and thereafter, Defendants Nassan and
> Curry engaged in various improper actions which were designed to
> taint the investigation.  Such actions included, but were not limited
> to filing false reports regarding how and why they discharged their
> weapons, providing false information to investigators and other
> officials, tainting evidence and involving other state police officers
> in the conspiracy and/or other officials in the conspiracy.

Compl. ¶ 27.

that defendants tampered or removed any evidence at the scene or conspired between

themselves and with other officers or officials to obstruct the investigation or perform any

of the overt actions in furtherance of the conspiracy like those seen in <u>Bell</u> or <u>Ryland</u>.

Thus, plaintiff failed to adduce sufficient evidence to show that defendants engaged in a

conspiracy here and this court will grant defendants' motion to dismiss plaintiff's

conspiracy claims under section 1983 set forth in count II of the Complaint.

### *(ii) Effect of death*

Even if plaintiff had provided sufficient evidence of an agreement between

defendants, as with all section 1983 claims, plaintiff here must show the deprivation of a

federally protected right by a person acting under a color of state law to prove a claim for

conspiracy under section 1983.  <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 633

(3d Cir. 1995).  The problem for plaintiff is that Ellerbe was deceased at the time of

defendants' alleged conspiracy and therefore there could be no federally protected right of

Ellerbe implicated by the facts of this case.  As noted above, both parties agree that

defendants acted under color of state law.  Defendants argue that plaintiff cannot show a

deprivation of a constitutional right here because section 1983 does not provide a claim to

the estate of Ellerbe based upon alleged constitutional violations that occurred after his

death.  Defendants are correct that plaintiff cannot state a claim for conspiracy to the

extent that he alleges the conspiracy violated Ellerbe's constitutional rights after his

death.  <u>See</u> <u>Love v. Bolinger</u>, 927 F. Supp. 1131, 1136 (S.D. Ind. 1996) (alleged cover up

could not have violated decedent's rights because it took place after his death); <u>Whitehurst</u> <u>v. Wright</u>, 592 F.2d 834, 840 (5th Cir. 1979) ("After death, one is no longer a person within our constitutional and statutory framework, and has no rights of which he may be deprived.").

### (iii) Effect of cover-up

Courts, however, have held that "conspiracy to cover up a killing, thereby obstructing legitimate efforts to vindicate the killing through judicial redress, interferes with the due process right of access to courts. . . ." <u>Bell v. City of Milwaukee</u>, 746 F.2d 1205, 1261 (7th Cir. 1984), <u>overruled on other grounds by</u> <u>Russ v. Watts</u>, 414 F.3d 783 (7th Cir. 2005). "This constitutional right is lost where . . . police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress." <u>Id.</u> at 1261. Thus, "[w]here the estate of a deceased person has a valid cause of action and where the wrongful actors conspire to prevent prosecution of the claim . . . the conspiracy's victims are the deceased's survivor," and those survivors have been deprived of their right to due process. <u>Id.</u> at 1264. A claim for conspiracy will be cognizable where the father of a child who has been killed files a wrongful death claim in state court and shows that the cover-up of the true facts of the killing rendered his right to seek redress hollow. <u>Id.</u> at 1262; <u>see</u> <u>Barret v. United States</u>, 689 F.2d 324, 332-33 (2d Cir. 1982) (holding that administratrix has standing to sue for estate's deprivation of the right to due process where she alleged that state officials conspired to conceal the facts of

the deceased's death); <u>Ryland v. Shapiro</u>, 708 F.2d 967, 972, 975 (5th Cir. 1983)

(successful conspiracy by prosecutor and assistant district attorney to cover up a murder

for eleven months that can amount to an interference with the right of access to courts can

be a constitutional violation); <u>Vasquez v. Hernandez</u>, 60 F.3d 325, 328 (7th Cir. 1995)

("[W]hen police officers conceal or obscure important facts about a crime from its

victims rendering hollow the right to seek redress, constitutional rights are undoubtedly

abridged.").

Here plaintiff, as a personal representative, may bring a claim for conspiracy if he

can show that defendants' alleged conspiracy violated his right to due process by

hampering his ability to bring his claims for wrongful death in court.  "[N]ot every act of

deception in connection with a judicial proceeding gives rise to" a constitutional

violation.  <u>Bell</u>, 746 F.2d at 1265. The holding in <u>Bell</u> was motivated in large part by the

egregious police conduct in that case and the extensive delay it caused.  <u>Id.</u> at 1264 ("our

holding is limited to the particularly egregious set of facts herein.  . . . [T]he conspirators

did everything in their power to cover up and conceal the facts within their sole

control.").  The "cornerstone" of the holding in <u>Bell</u> "was that the conspiracy had

prevented a full and open disclosure of facts crucial to the cause of action, rendering

hollow the plaintiffs' right of access."  <u>Vasquez v. Hernandez</u>, 60 F.3d 325, 329 (7th Cir.

1995).  Thus, "[a] cover-up leads to a denial of access to the courts only where the

cover-up was to some extent successful."  <u>Kies v. City of Aurora</u>, 149 F. Supp. 2d 421,

424 (N.D.Ill. 2001)(citing <u>Vasquez</u>, 60 F.3d at 329). "When there are no allegations indicating that a defendant's cover-up prevented a plaintiff from pursuing a tort action or that the value of such an action was reduced by the cover-up, there is no basis for a section 1983 action because there has been no injury beyond the underlying torts." <u>Id.</u> at 424 (citing <u>Johnson v. Chicago Police Officer</u>, No. 99 C 7396, 2000 WL 310320, at *2 (N.D. Ill. Mar.24, 2000). "[O]nly prefiling conduct that either prevents a plaintiff from filing suit or renders the plaintiff's access to the court ineffective or meaningless constitutes a constitutional violation." <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 511 (3d Cir. 2003)(citing <u>Swekel v. City of River Rouge</u>, 119 F.3d 1259, 1262-63 (6th Cir.1997)).

In <u>Bell</u>, the officer who shot Bell placed a knife in his hand after the shooting. He had his partner falsely claim that the officer had shot Bell in self-defense. <u>Bell</u>, 746 F.2d at 1215. The wrongful death claim of Bell's father first resulted in a mistrial and then was settled for a small amount that the father ultimately refused to accept. <u>Id.</u> at 1223. Twenty years later the partner of the officer who shot Bell admitted that the officer and he had covered up the truth of Bell's death. <u>Id.</u> at 1265. The court held that the obstruction of the efforts of Bell's survivors to vindicate the decedent and recover for the offense interfered with the due process right of access. <u>Id.</u> at 1264.

Similarly, in <u>Ryland</u>, a local prosecutor conspired with an assistant district attorney to cover up a murder committed by the prosecutor. <u>Ryland</u>, 708 F.2d at 969. The two did so by cancelling a scheduled autopsy, persuading the corner to sign a report even though

he never examined the body, and by representing to the police that the death was a suicide.  Id. at 969.  About eleven months later, the attorney general of their state obtained a conviction for murder.  Id. at 969.  The court concluded that the parents of the murder victim could show that they were deprived of their right of constitutional access to the courts to pursue their tort claim for wrongful death.  Id. at 973.  The court noted that "[t]he defendants' actions could have prejudiced the [parents'] chances of recovery in state court because the resulting delay would cause stale evidence and the fading of material facts in the minds of potential witnesses.  Moreover, it could well prove more extensive to litigate such action."  Id. at 975.

In Estate of Smith v. Marasco, 318 F.3d 498 (3d Cir. 2003), the court concluded that it could not find that the defendants' efforts at a cover-up prevented the plaintiffs "from filing suit or rendered their access to the courts ineffective or meaningless."  Id. at 512. The court emphasized that the plaintiffs "were able to bring this action and present substantial evidence of central importance to their case."  Id.  In the same opinion, the court held that fact-issues precluded summary judgment on the plaintiffs' excessive force, state-created danger, and unreasonable search claims.  Id. at 522-23.  Thus, the court held that "this very opinion demonstrates that the [plaintiffs] have been able to develop the facts in this case quite effectively."  Id. at 512.  This case is more like Marasco than Bell and Ryland.  Plaintiff has not shown any of the egregious circumstances present in Ryland and Bell.  See Swekel, 119 F.3d at 1264 ("Swekel alleges that the police

covered-up proof against one of their own, destroyed critical evidence, and delayed

Swekel's own investigation. These allegations, if true, would substantially prejudice

Swekel's ability to recover in state court.").

Viewing the disputed facts in the light favorable to plaintiff, plaintiff – at best –

has adduced evidence that defendants' stories are fabrications.  Plaintiff, however, has not

been prevented from filing suit within a reasonable time.  The shooting of  Ellerbe took

place on December 24, 2002, and the complaint was filed on February 14, 2003, less than

two months later.  Plaintiff also had the opportunity to engage in extensive discovery in

this case and has marshaled evidence to support the other claims asserted here.  This

court's denial of defendant's motion for summary judgment on plaintiff's most significant

constitutional claims shows, as in Marasco, that he has been able effectively to develop

the facts.

### 3. Wrongful death and survival claims under section 1983 – Counts IV and V

Defendants argue that the claims in counts IV and V which are claims for

"wrongful death" under section 1983 and the Pennsylvania Wrongful Death Statute

(count IV) and claims for a "survival action" under section 1983 and the laws of

Pennsylvania (count V) are duplicative of the claims set forth in count I.  On that basis

defendants argue summary judgment should be granted in their favor on those claims.

Defendants do not flush out this argument in any detail and do not cite any legal authority

for this argument; instead, defendants assert that these counts are simply a "reiteration" of

the other section 1983 claims and must be dismissed for the same reasons.  Plaintiff

argues without elaboration that Pennsylvania law recognizes claims for both survivorship

and wrongful death actions and that state law is the principal reference point to determine

the survival of civil rights actions.

As a threshold matter, it is helpful to clarify the nature of wrongful death and

survival actions under Pennsylvania law.  "A wrongful death action in Pennsylvania did

not exist under the common law, but is a statutory cause of action under 42 Pa. Cons.Stat.

Ann. § 8301."  Walsh v. Strenz, 63 F.Supp.2d 548, 550 (M.D. Pa. 1999)(citing Tulewicz

v. SEPTA, 606 A.2d 427, 431 (1992); Hodge v. Loveland, 690 A.2d 243, 245 (Pa. Super.

Ct. 1997), reargument denied, allocatur denied, 723 A.2d 672 (Pa. 1998) (table)).  Section

8301 provides:

> **§ 8301. Death action**
> (a) General rule.--An action may be brought, under
> procedures prescribed by general rules, to recover damages
> for the death of an individual caused by the wrongful act or
> neglect or unlawful violence or negligence of another if no
> recovery for the same damages claimed in the wrongful death
> action was obtained by the injured individual during his
> lifetime and any prior actions for the same injuries are
> consolidated with the wrongful death claim so as to avoid a
> duplicate recovery.
>
> (b) Beneficiaries.--Except as provided in subsection (d), the
> right of action created by this section shall exist only for the
> benefit of the spouse, children or parents of the deceased,
> whether or not citizens or residents of this Commonwealth or
> elsewhere. The damages recovered shall be distributed to the
> beneficiaries in the proportion they would take the personal
> estate of the decedent in the case of intestacy and without

> liability to creditors of the deceased person under the statutes
> of this Commonwealth.
>
> (c) Special damages.--In an action brought under subsection
> (a), the plaintiff shall be entitled to recover, in addition to
> other damages, damages for reasonable hospital, nursing,
> medical, funeral expenses and expenses of administration
> necessitated by reason of injuries causing death.
>
> (d) Action by personal representative.--If no person is eligible
> to recover damages under subsection (b), the personal
> representative of the deceased may bring an action to recover
> damages for reasonable hospital, nursing, medical, funeral
> expenses and expenses of administration necessitated by
> reason of injuries causing death.

42 PA.CONS.STAT.ANN. § 8301.  "[The Wrongful Death Statute's] purpose is to compensate the enumerated relatives for the pecuniary loss in the form of lost earnings occasioned by the death, as well as services the decedent would have performed for the family."  Id. (citing Hodge, 690 A.2d 243 at 245-46; Slaseman v. Myers, 455 A.2d 1213, 1218 (Pa. Super. Ct. 1983)).  "Although brought by the personal representative of the estate of the decedent, the action is brought on behalf of the decedent's survivors and not the estate."  Id. (citing Tulewicz, 606 A.2d at 431; Hodge, 690 A.2d at 246).  "The wrongful death statute is subject to strict construction."  Id. (citing  Hodge 690 A.2d at 249).

A survival action under Pennsylvania law is also a statutory creature.  Section 8302 provides:

> **§ 8302. Survival action**
> All causes of action or proceedings, real or personal, shall
> survive the death of the plaintiff or of the defendant, or the
> death of one or more joint plaintiffs or defendants.

42 PA.CONS.STAT.ANN. § 8302.  "A survival action under 42 Pa. Cons.Stat. § 8302 is

brought by the decedent's personal representative for the benefit of the estate."  Walsh v.

Strenz, 63 F.Supp.2d at 550 (citing Kiser v. Schulte, 648 A.2d 1, 4 (Pa. 1994)).  "It is not

a new cause of action but continues in the personal representative the right of action

which accrued to the decedent at common law as a result of the tort."  Id. (citing  Kiser,

648 A.2d at 4; Tulewicz, 606 A.2d at 431).

While a survival action is not a new claim, but continues in the personal

representative the right of action which accrued to the decedent at common law as a result

of the tort, a wrongful death action is a distinct claim from any the deceased might have

had if he had survived.  For this reason, defendant's argument that counts IV and V must

be dismissed because each is a "reiteration" of count I must be separately analyzed for

each count.

### a. Section 1983 survival action - Count V

Section 1983 provides for liability to "the party injured" but does not explicitly

allow or foreclose survival of the action on behalf of the estate of the injured party.  42

U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation,

custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes

to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured . . . .")(emphasis added); see

Hall v. Wooten, 506 F.2d 564, 568 (6th Cir. 1974).  Federal courts  have construed 42

U.S.C. § 1988, however, to authorize district courts to refer to the law of the state to

determine whether an action under section 1983 for injury to the person survives.  See

Hall, 506 F.2d at 568.

      Section 1988 provides in relevant part:

> **(a) Applicability of statutory and common law.**
>  The jurisdiction in civil and criminal matters conferred on the
> district courts . . . . for the protection of all persons in the
> United States in their civil rights, and for their vindication,
> shall be exercised and enforced in conformity with the laws of
> the United States, so far as such laws are suitable to carry the
> same into effect; but in all cases where they are not adapted to
> the object, or are deficient in the provisions necessary to
> furnish suitable remedies and punish offenses against law, the
> common law, as modified and changed by the constitution
> and statutes of the State wherein the court having jurisdiction
> of such civil or criminal cause is held, so far as the same is
> not inconsistent with the Constitution and laws of the United
> States, shall be extended to and govern the said courts in the
> trial and disposition of the cause, and, if it is of a criminal
> nature, in the infliction of punishment on the party found
> guilty.

42 U.S.C. § 1988(a).

      In Hall, the United States Court of Appeals for the Sixth Circuit –  recognizing

other federal court decisions, legislative intent, and Supreme Court case law construing

section 1988 – construed section 1988 to direct district courts to state survivorship

statutes to determine whether section 1983 claims survive upon the death of an injured party.  See 506 F.2d at 566-69 (citing, inter alia, Moor v. County of Alameda, 411 U.S. 693 (1973)); see also Moor, 411 U.S. at 702-03 (construing section 1988)("[I]nevitably existing federal law will not cover every issue that may arise in the context of a federal civil rights action. Thus, § 1988 proceeds to authorize federal courts, where federal law is unsuited or insufficient 'to furnish suitable remedies,' to look to principles of the common law, as altered by state law, so long as such principles are not inconsistent with the Constitution and laws of the United States.").  In Moor, the Supreme Court pointed out in a footnote that:

> One such problem [not covered by federal law] has been the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant. Although an injured party's personal claim was extinguished at common law upon the death of either the injured party himself or the alleged wrongdoer,. . . , it has been held that pursuant to § 1988 state survivorship statutes which reverse the common-law rule may be used in the context of actions brought under § 1983.

Id.at 703 n.14 (citations omitted).

The United States Supreme Court clarified in Robertson v. Wegmann, 436 U.S. 584 (1978), that "the decision as to the applicable survivorship rule is governed by 42 U.S.C. § 1988."  Id. at 587.  The Court noted that "t]his statute recognizes that in certain areas 'federal law is unsuited or insufficient "to furnish suitable remedies"'; federal law simply does not 'cover every issue that may arise in the context of a federal civil rights action.'"  Id. (quoting Moor, 411 U.S. at 703, 702 (quoting 42 U.S.C. § 1988)).

"When federal law is thus 'deficient,' § 1988 instructs us to turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are 'not inconsistent with the Constitution and laws of the United States.'" Id. (quoting 42 U.S.C. § 1988)).  The Court made clear:

> As we noted in Moor v. County of Alameda, and as was recognized by both courts below, one specific area not covered by federal law is that relating to "the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant." . . . State statutes governing the survival of state actions do exist, however. These statutes, which vary widely with regard to both the types of claims that survive and the parties as to whom survivorship is allowed, . . . , were intended to modify the simple, if harsh, 19th-century common-law rule: "[A]n injured party's personal claim was [always] extinguished . . . upon the death of either the injured party himself or the alleged wrongdoer." . . . . **Under § 1988, this state statutory law, modifying the common law, provides the principal reference point in determining survival of civil rights actions**, subject to the important proviso that state law may not be applied when it is "inconsistent with the Constitution and laws of the United States."

Id. at 589-90 (internal citations, quotations, and footnotes omitted)(emphasis added).

Under these decisions, in this case, the court finds that count V, asserting a section 1983 survival action, does not create a new claim.  Instead, reference to Pennsylvania's survival action in light of section 1988 continues in plaintiff, the personal representative of Ellerbe, the right of action which accrued to Ellerbe as a result of the section 1983 claim against defendants.  The court, therefore, will not grant defendant's motion to dismiss with respect to count V.  Nor will the court recognize count V as asserting an

independent claim.  Instead, reference to count V in the complaint allows for plaintiff,

under Pennsylvania's survival statute, to continue in Ellerbe's place as his personal

representative with respect to Ellerbe's claim under section 1983.  See 42

PA.CONS.STAT.ANN. § 8302 ("All causes of action or proceedings, real or personal, shall

survive the death of the plaintiff or of the defendant, or the death of one or more joint

plaintiffs or defendants.").

### b. Section 1983 wrongful death claim  - Count IV

A wrongful death claim, distinguished from a claim under Pennsylvania's

survivorship statute, however, does assert a claim independent of a decedent's claim.  See

Sunderland v. R.A. Barlow Homebuilders, 791 A.2d 384, 390 (Pa. Super. Ct. 2002)

(citations omitted)), aff'd,  576 Pa. 22 (2003)("The purpose of the Wrongful Death Act is

to compensate certain enumerated relatives of the deceased for the pecuniary loss

occasioned to them through deprivation of the part of the earnings of the deceased which

they would have received from him had he lived.  Thus, the action is not for damages

sustained by the decedent, but for damages to his or her family caused by the death.   The

action does not compensate the decedent's estate.").

In this case the court concludes that court IV is not duplicative of count I, but

without further briefing from the parties on this matter, cannot conclude that section 1983

encompasses this kind of claim.  Section 1988 does not create claims, it only enables the

federal courts to apply state law "to furnish suitable remedies."  The motion to dismiss the

section 1983 claims set forth in count IV will be granted without prejudice to plaintiff's

right to reassert this claim provided plaintiff provides legal support showing that there is a

basis for this claim.

### B. State law claims - Counts III, VI, VII

Plaintiff brings various state law claims for the intentional torts of gross

negligence, willful and wanton misconduct, assault and battery, and intentional infliction

of emotional distress (Count III).  Counts VI and VII raise the claims set forth in count

III in the context of wrongful death and survival actions.  Defendants seek to dismiss the

state law claims solely on the ground that defendants, as employees of the Pennsylvania

State Police, are immune from state law claims by reason of sovereign immunity.

Under Pennsylvania law, it is undisputed that Commonwealth officials[29] and

employees when acting within the scope of their employment are immune from suit

under 1 PA. CONST. STAT. § 2310.[30]  See Faust v. Pennsylvania, 592 A.2d 835, 839 (Pa.

--------

[29] 42 PA.CONS.STAT.ANN. § 8501 defines a "Commonwealth party" as "[a] Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment."

[30] 1 PA.CONS.STAT.ANN. § 2310 provides:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its

Commw. Ct. 1991), <u>allocatur denied</u>, 530 Pa. 647 (1992).  The only exceptions to this general rule, which are not applicable in this case, are those circumstances for which the Commonwealth specifically waives immunity.  42 PA. CONS. STAT. § 8522.  Where the claim emanates from intentional torts, the only question to be resolved is whether the employee was acting within the scope of his or her employment when the challenged conduct occurred.  <u>La Frankie v. Miklich</u>, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).

The parties agree that in determining whether an employee is acting within the scope of employment for immunity purposes under 1 PA. CONST. STAT. § 2310 Pennsylvania courts apply the RESTATEMENT (SECOND) of AGENCY § 228.  <u>See</u> <u>Brumfield v. Sanders</u>, 232 F.3d 376, 380 (3d Cir. 2000).  Section 228 provides in relevant part:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is the kind [the employee] is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master; and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

RESTATEMENT (SECOND) of AGENCY § 228.

---

officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

Defendants here allege that they were clearly acting within the scope of their employment since the incident in question occurred while they were on duty, in uniform, in a marked police car, and were within their working hours when they encountered Ellerbe driving a stolen car and gave chase to him.  In addition, defendants were responding to a call they heard on their police radio when they looked for the Bronco. They also argue that, since plaintiff alleges that defendants were acting "under the color of state law" for the purposes of his section 1983 claims, plaintiff has agreed that defendants were acting "within the scope of their employment."  Defendants argue that the  two concepts are functionally the same.  Plaintiff, however, does not agree that the two concepts are equivalent and argues that defendants' assertion fails under the last prong of elements set forth in section 228 of the Restatement (Second) of Agency because intentionally shooting at an unarmed boy who does not pose a threat is not the type of force "expected by the master."

The concepts of acting "under color of state law" and acting "within the scope of employment" while comparable are not the same.  Compare Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994) (acting under color of law means that the officer depends upon the cloak of the state's authority as a means to commit the alleged acts and that authority enables the officer to do what he did) with RESTATEMENT (SECOND) of AGENCY § 228.  In this case, defendants' actions clearly occurred "under the color of state law" as defined by the Supreme Court in  Monroe v. Pape, 365 U.S. 167, 172

(1961), <u>overruled on other grounds</u>, <u>Monell v. Dept. of Social Services of City of New York</u>, 436 U.S. 658 (1978), ("'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.'" (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941))).

On the other hand, this court previously rejected the defendants' motion to dismiss on the issue of the scope of employment because it concluded that it can "conceive of circumstances under which an officer "cloaked in the state's authority" could overstep his official duties and act outside the scope of his employment by engaging in intentional actions – firing a gun at a person who poses no threat to the officer – that would be unexpected by the Commonwealth." Memorandum Order (Doc. No. 39) at 6 (Entered Aug, 27, 2004). Thus, this court concluded that this dispute would be better dealt with at the summary judgment stage. As noted above, the facts taken in the light most favorable to the plaintiff at summary judgment would permit a reasonable trier of fact to conclude that defendants Nassan and Curry fired their guns at a person who posed no threat to them. That kind of intentional conduct could be considered unexpected by an employer. <u>See</u> <u>Haas v. Barto</u>, 829 F. Supp. 729, 734 (M.D. Pa.1993) (citing <u>Maier v. Patterson</u>, 553 F.Supp. 150, 154 (E.D.Pa.1982) (citing <u>Howard v. Zaney Bar</u>, 369 Pa. 155, 85 A.2d 401 (1955))) ("An act is unexpectable by the master when it is done in a whimsical or outrageous manner."). Thus, although defendants Nassan and Curry may have been

acting under the color of state law, this court cannot conclude at the summary judgment stage of the proceedings that they were acting within the scope of their employment. That issue will need to be resolved by a jury.  This court will deny defendants' motion for summary judgment with respect to plaintiff's state law claims.[31]

## V. CONCLUSION

Defendants' motion for summary judgment will be granted with respect to the federal claims set forth in count II.  Defendants' motion with respect to the federal claims set forth in count IV will be granted without prejudice to plaintiff's ability to reassert those claims based upon appropriate legal authority.  The federal claims set forth in count V are treated as being subsumed into count I.  Defendants' motion for summary judgment will be denied in all other respects.  An appropriate order follows.

---

[31] Plaintiff also claims that 42 PA. CONS. STAT. § 8550 expressly authorizes actions against government employees for their willful misconduct. That section provides a basis for imposing liability "against a local agency or employee . . . for damages on account of an injury caused by the action of the employee . . . that . . . constituted a crime, actual fraud, actual malice or willful misconduct."  42 PA. CONS. STAT. § 8550.  42 PA. CONS. STAT. § 8501 defines a "local agency" as a "government unit other than the Commonwealth government."  Section 8550 does not apply to a Pennsylvania state police officer because he is a Commonwealth employee. Heinly v. Queen, 146 F.R.D. 102, 109-10 (E.D.Pa.1993).  Thus, this section is not applicable to defendants.

100

## ORDER

**AND NOW**, this 30th day of March 2007, upon consideration of the parties'

arguments and supporting documents.

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. No. 68)

is **GRANTED** as to all claims set forth count II and is **GRANTED** without prejudice as

to all federal claims set forth in count IV and **DENIED** in all other respects.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc:     Counsel of record

101